[No. G005790. Fourth Dist., Div. Three. Apr. 25, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EARL PRICE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Goldfein, Schwartzberg & Stark and Richard Schwartzberg for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Pat Zaharopoulos and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SCOVILLE, P. J.**—Defendant, Ronald Earl Price, was charged in count I with having conspired with Michael Sandoval and Larry Badgwell to commit the crimes of transportation of cocaine and possession of cocaine for sale. (Health & Saf. Code, §§ 11351 and 11352.) Twenty overt acts were alleged. Defendant was also charged in count II with transporting or selling cocaine (Health & Saf. Code, § 11352) and in count III with possession of cocaine for sale. (Health & Saf. Code, § 11351.) In addition it was alleged the cocaine involved in counts II and III exceeded 10 pounds by weight

within the meaning of Health and Safety Code section 11370.4 and that Michael Sandoval had in his possession 28.5 grams or more of cocaine and 57 grams or more of a substance containing cocaine within the meaning of Penal Code section 1203.073, subdivision (b)(1).

A jury found defendant guilty on all counts. It found the quantity allegations true, but only found 10 of the 20 charged overt acts were committed.

## FACTS

On February 23, 1986, Mark Mead, a cocaine dealer who was acting as a confidential informant for the Department of Justice, met with Mark Sandoval at Las Brisas restaurant in Laguna Beach. Mead asked Sandoval if he could get him five to nine kilos of cocaine. Sandoval assured him he could and quoted a price of $34,000 a kilo. During the discussion, Sandoval referred to other people he would have to work with to get the cocaine. He was not sure "if he could do it in Santa Cruz or in Orange County, but he knew he could do it. He just wasn't sure who was going to be able to get him the best price and whatnot." When the two men parted company on February 23 it was clear they had an agreement, but "the arrangement[s] would be made later."

Thereafter the two men exchanged many phone calls. The usual procedure was for Mead to call Sandoval and leave a number of a pay phone in Orange County on his message machine for Sandoval to call back. Sometimes Mead would call Sandoval at a number in Aptos and he may have called Sandoval at Sandoval's parents' house in San Clemente "once or twice."

On March 16, 1986, Sandoval called Mead and told him "[h]e had put everything together," and was ready to go through with the deal. Sandoval said he would fly to Southern California the next day and he would contact Mead by telephoning Mead's answering service in Los Angeles at about 2 p.m. Mead left the number of a "cool phone"[1] in Edward Manavian's office at the Department of Justice in Orange. Mead waited, with Manavian, for the telephone call.

When Sandoval called, the conversation was recorded. Sandoval asked Mead if he had "all the paperwork and stuff?" Mead testified Sandoval was actually asking whether Mead had the money, and Mead answered that he did. Mead told Sandoval, "I can do 7 right now and then 5 after you're done with this one." Mead testified he meant he had the money for a sale of seven kilos of cocaine and could buy five more later in a transaction which was to take place in North Hollywood. Sandoval told Mead to meet him at Orville

---

[1] Mead testified a "cool phone" is one that cannot be traced to the police.

& Wilbur's restaurant in Manhattan Beach. Mead said he could get there at about 5:30 p.m. or 6 p.m.

Before Mead drove to Manhattan Beach, Manavian searched his person and his vehicle to make sure Mead had no contraband or money with him. He also supplied Mead with a wire transmitter.

At 7 p.m. Mead met Sandoval in front of Orville & Wilbur's restaurant. Manavian, who was surveilling the area with several other officers, observed the meeting. Manavian noticed defendant sitting on a planter in front of the restaurant watching Mead and Sandoval walk westward toward Highland.

Sandoval wanted to see the money first. Mead told Sandoval "my people" had to see the cocaine before they "would release any money." Sandoval did not want to do the deal in that manner. They reached an impasse. Sandoval indicated he had to talk to his "friends or partners," and they parted company.

Manavian, who was in his car, had to move at about the time Mead and Sandoval were walking back toward the restaurant. Manavian moved to a residential area south of the restaurant where he saw defendant sitting in a yellow Volkswagen.[2] Five minutes later, Manavian observed defendant drive around in front of the restaurant and pick Sandoval up, make a U-turn and drive eastbound on Rosecrans toward Sepulveda.

Mead called Manavian on his beeper. Agent Crawford was acting as the money man and he was not participating in the surveillance.[3] After talking to Manavian and Crawford, Mead met Crawford in a parking structure on the corner of Highland and Rosecrans and told him that Sandoval wanted to see the money first.

Sandoval and Mead had several more inconclusive meetings in front of Orville & Wilbur's restaurant, each insisting that the deal be done his way. Manavian testified defendant transported Sandoval to and from most of these meetings in the same yellow Volkswagen. On one occasion, Manavian followed the Volkswagen to the Edwardian Inn, a nearby hotel. Manavian had agents Rincon and Vasquez follow Sandoval and defendant into the hotel. Rincon testified that once inside the hotel he saw Sandoval at a pay phone, but he lost sight of defendant. Badgwell drove Sandoval to the last meeting. Manavian saw Sandoval meet with Mead at Mead's van and then go back and talk to Badgwell. Finally, Sandoval capitulated. He got into Mead's van and directed him to the Edwardian Inn.

---

[2] The parties stipulated that the yellow Volkswagen was registered to defendant.

[3] The various officers who were surveilling the transaction were driving around the area in unmarked vehicles. They testified to what they saw as they traversed the area, some seeing one part of the transaction and others seeing other parts.

When they entered the hotel, Sandoval told Mead to wait in the bar area. Sandoval was gone for about five minutes. When he returned he took Mead to room 109.[4] Sandoval opened the room with a key and they entered. Sandoval was "agitated" and indicated that someone had been in the room. He picked up the phone and punched three numbers on the phone keyboard. He said, "Ron, have you been in here?" Defendant's name is Ronald.

After Sandoval put the phone down he took "a black gym bag-type bag" from behind a chair. The bag contained objects wrapped in "a dark black-brown tape" which looked like kilos of cocaine. Sandoval opened one of the objects. Mead tasted the substance inside, and it tasted like cocaine. Mead said, "Manavian will really like this." Mead was wearing a transmitter, and this sentence was the prearranged arrest code which the surveilling officers were waiting to hear. As Mead and Sandoval left room 109, Sandoval was arrested by agents Rincon and Vasquez.

After agent Crawford became aware Sandoval had been arrested or detained, Crawford was directed to the second floor of the hotel with other agents and police officers. As they walked down the hallway towards room 221, Crawford saw defendant walk out the door of room 221. Defendant was placed under arrest; and when Crawford patted defendant down, he discovered the key to hotel room 109 in defendant's possession.

The officers forced entry into room 221 after knocking, announcing their purpose and receiving no reply. No one was inside, but the sliding glass door leading to the balcony was open. Shortly thereafter, Larry Badgwell was found hiding in some shrubbery in the hotel courtyard located beneath the balcony to room 221. Officers also found $15,000 cash in one of the planters near where Badgwell was found.

### DISCUSSION

### I

### *Territorial Jurisdiction*

Defendant contends Orange County had no "territorial jurisdiction" to prosecute defendant for the crimes alleged because they took place in Los Angeles County. Defendant claims directing a telephone call into the County of Orange is an insufficient basis for the exercise of venue by the courts of this county.

We consider the factual basis for venue on the conspiracy charge first. Penal Code section 182 provides, in pertinent part: "All cases of conspiracy

---

[4]Mr. Robinson, the night manager of the Edwardian Inn, identified Sandoval as the man who rented room 109 that evening and Badgwell as the man who rented room 221.

may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done." ■ An overt act need not be a criminal act. (*People* v. *Lockett* (1972) 25 Cal.App.3d 433, 440 [102 Cal.Rptr. 41].) Further, an overt act may be committed by just one conspirator; other members of the conspiracy need not be present; and once committed, all members of the conspiracy are bound by the overt act. (*People* v. *Jones* (1964) 228 Cal.App.2d 74, 87-88 [39 Cal.Rptr. 302].)

■ Venue in a criminal case is a question of fact which may be proved by either direct or circumstantial evidence and need only be proved by a preponderance of the evidence. (*People* v. *Tabucchi* (1976) 64 Cal.App.3d 133, 141 [134 Cal.Rptr. 245]; *People* v. *Arline* (1970) 13 Cal.App.3d 200, 203 [91 Cal.Rptr. 520] [overruled on another point in *People* v. *Hall* (1986) 41 Cal.3d 826, 834 (226 Cal.Rptr. 112, 718 P.2d 99)].)

■ As the defendant points out, the jury was given a special "finding" verdict form for the alleged overt acts which contained 20 blanks. They found overt acts 11-20 true. All the acts which took place in Orange County were alleged in overt acts 1-9. However, this circumstance does not preclude our looking to the evidence proved with respect to acts performed in Orange County. The special finding form was directed to proof of the conspiracy charge and hence the jury made its determination as to it based on a standard of beyond a reasonable doubt. They were, however, also instructed on the venue question that the prosecution had to prove venue in Orange County by a preponderance of the evidence and if they did not find venue under such standard they must acquit.[5] They did not acquit. Hence, we may infer a determination by the jury that the prosecution carried its burden under the preponderance standard on the venue question. ■ We are left with the task of assessing the sufficiency of the evidence.

Here, unopposed testimony detailed the meeting between Sandoval and Mead at the Las Brisas restaurant in Orange County. In addition, preliminary arrangements leading up to the Los Angeles transaction were made over the telephone by Sandoval, and Mead was in Orange County when he received those communications.

---

[5] The instruction given to the jury is, in part, as follows: "The prosecution has the burden of proving by a preponderance of the evidence that each of the crimes charged can be prosecuted in Orange County according to the instructions I have just read to you. [¶] Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of the truth. [¶] If you are not convinced by the preponderance of the evidence that any of the crimes charged can be prosecuted in Orange County, the defendant is entitled to a verdict of acquittal on that crime. . . ."

■ Defendant's argument that he was not part of the conspiracy at the time of the Las Brisas meeting misses the mark. "It is not necessary that a defendant be shown to have been a member of a conspiracy from its inception, but one who joins a conspiracy after it is formed, and actively participates in it, thereby adopts the previous acts and declarations of his fellow conspirators. [Citations.]" (*People* v. *Aday* (1964) 226 Cal.App.2d 520, 534 [38 Cal.Rptr. 199].)[6]

■ More telling is defendant's argument that the evidence is insufficient to prove an agreement between conspirators had been reached at the time of the Las Brisas meeting. However, even accepting this version of the facts, defendant concedes a conspiracy had been formed, at least, by the time of the March 16 telephone call from Sandoval to Mead in Orange County, because at that time Sandoval said, in effect, that everything was arranged and he was ready to proceed with the sale. ■ Defendant contends, "a telephone call from outside the county of venue to the county of venue is insufficient to authorize the trial of conspiracy and substantive offenses in the county of venue." We disagree.

In *People* v. *Kellett* (1982) 134 Cal.App.3d 949, 956-957 [185 Cal.Rptr. 1], the court held preliminary arrangements made in the course of telephone calls within the boundaries of the forum county were a sufficient basis for the exercise of venue, although the crimes were consummated in another county. In *Ondarza* v. *Superior Court* (1980) 106 Cal.App.3d 195, 200-201 [164 Cal.Rptr. 892], the court found evidence that the petitioner made preliminary arrangements for the crime including a telephone call from the forum county into another county in which the crime was consummated a sufficient basis for the exercise of venue. Defendant seeks to distinguish these cases from the one before us based on the fact that in each the charged criminal initiated the phone call from the forum county. Defendant claims venue should not be upheld when the charged criminal makes a telephone call into the forum county. We think this puts too fine a distinction upon the law in this area.

Penal Code section 781, which is applicable generally to crimes committed in more than one jurisdiction, is similar in content to Penal Code section 182 in that it provides for a liberal exercise of jurisdiction by any of the possible forums.[7] In *People* v. *Powell* (1967) 67 Cal.2d 32, 63 [59 Cal.Rptr.

---

[6] This is not to say, of course, that a coconspirator is liable for crimes committed by a member or members of the conspiracy before he joined the conspiracy. (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260].) He does, however, adopt prior acts of his fellow conspirators to the extent they show the nature and objectives of the conspiracy. (*People* v. *Weiss* (1958) 50 Cal.2d 535, 565-566 [327 P.2d 527].)

[7] Penal Code section 781 provides, "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requi-

817, 429 P.2d 137], the court noted that section 781 "was intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction. [Citations.]" For this reason, " . . . section 781 is liberally construed to vest jurisdictional venue in the court of a county where only preliminary acts leading to the commission of a crime in another territorial jurisdiction of California occur. [Citations.]" (*People* v. *Chapman* (1977) 72 Cal.App.3d 6, 11 [139 Cal.Rptr. 808].) In our view, the same liberal construction should be given to Penal Code section 182. Hence, we conclude a telephone call for the purpose of planning a crime received within the forum county is an adequate basis for venue, despite the fact the call was originated outside the county.

■ The above reasoning is equally applicable to defendant's argument respecting proper venue of the transportation and sale counts. Under Penal Code section 781, jurisdictional venue rests in a county where preliminary acts leading to the commission of a crime occur, even though the crime itself is committed in another county. (*People* v. *Bismillah* (1989) 208 Cal.App.3d 80, 85-86 [256 Cal.Rptr. 25]; *People* v. *Powell, supra,* 67 Cal.2d 32, 62-63; *People* v. *Kellett, supra,* 134 Cal.App.3d 949, 956-957; *People* v. *Chapman, supra,* 72 Cal.App.3d 6, 11.)

II

*Instructions*

■ Defendant, relying on *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], contends the trial court had a sua sponte duty to instruct the jury that, before it could find the allegation defendant offered to sell or transport more than 10 pounds of cocaine (Health & Saf. Code, § 11370.4) to be true, it must find that defendant had actual knowledge of the quantity or the intent to possess the specific quantity involved.[8]

In *People* v. *Beeman, supra,* 35 Cal.3d 547, 560, the court held that to convict a defendant as an aider and abettor the prosecution must prove the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" The court disapproved

---

site to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

[8] The pertinent provisions of Health and Safety Code section 11370.4 provide for a five-year enhancement when a person is convicted of Health and Safety Code section 11351 or 11352 and the amount of cocaine involved exceeds 10 pounds by weight.

old CALJIC No. 3.01 and suggested "an appropriate instruction" in its place. (*Id.,* at p. 561.)

Here, the jury was properly instructed under *Beeman* that, "A person aids and abets the commission or attempted commission of a crime when he or she, (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, by act or advice aids, promotes, encourages or instigates the commission of the crime. . . ." (CALJIC No. 3.01 (1984 rev.).)

Defendant concedes the aiding and abetting instructions were adequate as to the charged crimes of sale and transportation of cocaine, but argues the jury should have been instructed that it must find defendant also intended to possess or sell 10 pounds or more of cocaine. We disagree. The enhancement does not require specific intent. It merely provides when the amount sold is more than a certain amount, an enhanced sentence may result.[9] Once it is proved defendant intended to possess or sell cocaine, application of the enhancement is dependent upon a measurement of the amount of cocaine involved.

An analogous situation was presented in *People* v. *DeLeon* (1982) 138 Cal.App.3d 602 [188 Cal.Rptr. 63]. In that case defendants took the victim's car, after forcing him off the road, by attacking him with pruning shears and a tire iron. Providentially, the victim's briefcase containing numerous silver and gold coins and diamonds was left in the car. Defendants later abandoned the car and took the briefcase. The total loss to the victim was $37,781. Defendants contended a great-taking enhancement under Penal Code section 12022.6 was not applicable "because the evidence is insufficient to show that appellants knew of the existence and value of the coins at the time they used force to take the car." (*Id.,* at p. 606.) The court disagreed, stating "Quite simply, appellants intentionally took the car, and the victim's loss as a result of that incident was more than $25,000. The statute requires an intentional taking, but that element was satisfied by taking the car. The statute by its terms draws a distinction between the taking and the loss. It does not by its terms require the taking of $25,000, it requires an intentional taking, damage or destruction of property in the commission of any felony, 'and the loss exceeds' $25,000." (*Ibid.*)

Health and Safety Code section 11370.4 is a similar enhancement statute in that it requires only a conviction under section 11351 or 11352, among

---

[9] Health and Safety Code section 11370.4 provides in pertinent part, "(a) Any person convicted of a violation of Section 11351, . . . or 11352 with respect to a substance containing . . . cocaine . . . shall receive an additional term as follows: . . . [¶] (2) Where the substance exceeds 10 pounds by weight, the person shall receive an additional term of five years. . . ."

others. Then, where "the substance exceeds 10 pounds," the enhancement is imposed. No special intent or knowledge is required under the statute or under *Beeman.*

We believe the aider and abettor instructions given were adequate on the issue of intent. ■ The addition sought by defendant was, if anything, a clarification of the scope of the intent, and hence sua sponte instructions were not required. "Sua sponte instructions are required only ' " 'on the general principles of law relevant to the issues *raised by the evidence.* [Citations.] The general principles of law governing the case are those principles closely and openly connected with the *facts* before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" ' [Citation.]" (*People* v. *Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803].)

■ While we can imagine a set of circumstances which might require a clarifying instruction such as is suggested by defendant, this clearly is not such a case. Because the evidence raised no issue with respect to defendant's knowledge as to the amount of cocaine involved, and because the court correctly instructed the jury as to the law with respect to the intent necessary to a conviction of an aider and abettor, "it was defendant's obligation to request any clarifying or amplifying instruction on that subject. [Citation.]" (*People* v. *Kimble, supra,* 44 Cal.3d 480, 503.)

### III-IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed, and the matter is remanded for resentencing.

Crosby, J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 19, 1989.

---

*See footnote, *ante,* page 1183.