[No. A047810. First Dist., Div. Three. July 5, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK LYNN RIPPBERGER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts VIII, IX and X.

## COUNSEL

Mackenroth, Seley & Anwyl, David E. Mackenroth, and Robert A. Cutbirth for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MERRILL, J.—Mark Lynn Rippberger and his wife Susan Edna Middleton appeal from a conviction of felony child endangerment. The conviction was based on the death of appellants' eight-month-old daughter, caused by bacterial meningitis after a fifteen-day illness during which appellants withheld medical attention and treatment on the basis of their beliefs as Christian Scientists. We affirm the judgment of conviction.

I

### FACTUAL AND PROCEDURAL BACKGROUND

Eight-month-old Natalie Middleton-Rippberger died on December 9, 1984. Subsequently, on the basis of an autopsy, her death was determined to have been caused by acute purulent meningitis. Appellants Rippberger and Middleton were charged by information with involuntary manslaughter (Pen. Code, § 192, subd. (b)) and felony child endangerment (Pen. Code, § 273a, subd. (1)). After the trial court's overruling of appellants' demurrer and denial of their motion to dismiss, and this court's denial of appellants' petition for a writ of prohibition and stay of trial, the Supreme Court stayed the trial and granted review. After the filing of its opinion in *Walker* v. *Superior Court* (1988) 47 Cal.3d 112 [253 Cal.Rptr. 1, 763 P.2d 852]

(hereafter *Walker*), the Supreme Court dismissed appellants' petition, vacated the stay and remanded the matter to this court. We then returned the case to the trial court.

At trial before a jury, the prosecution offered the testimony of three witnesses to prove that appellants wrongfully endangered the life and health of their daughter by willfully withholding medical care from her: Therese Miller, a Christian Science visiting nurse; A. Jay Chapman, M.D., a forensic pathologist, and Michael W. Witwer, M.D., an expert in infectious diseases. It was stipulated that Natalie was appellants' child, and that she died at their home on December 9, 1984.

Miller testified that at all times relevant to this case, she was a Christian Science graduate visiting nurse, who had completed a three-year course of training at a Christian Science accredited facility and worked full-time making house calls at the homes of Christian Scientists. On December 2, 1984, she was summoned to appellants' home in the vicinity of Healdsburg either by appellants or by "the Christian Science Practitioner on the case." As a visiting Christian Science nurse she could not have been called onto the case unless there was an attending Christian Science practitioner involved.

When Miller arrived at appellants' home on December 2, she found both of them with Natalie, along with their other children. Miller found that Natalie "was very warm to the touch"; that she was "somewhat responsive"; that "her eyes tended to roll back in her head"; and that "she cried when her position was changed." Miller testified that she did not use a thermometer to ascertain the child's temperature, because "as Christian Science nurses we do not take temperatures." Appellants told Miller that Natalie had already been sick for seven days.

After staying with the child for an hour, Miller "just advised [appellants] to keep the baby warm and to keep trying to give [her] nourishment." She also recommended that appellants notify the Christian Science Church Committee on Publications because Natalie's case did not appear to be responding to prayerful treatment as quickly as it should be. Miller described the committee on publications as a church organization that oversees the "legal aspects of things" and that stays "in touch with cases that maybe aren't yielding as quickly to the prayerful treatment as they should be." Miller also reported her findings to appellants' Christian Science practitioner.

Thereafter, Miller visited appellants every day for several days. During her second visit on December 3, 1984, Miller observed no change in

Natalie's condition. However, the next day, December 4, Miller observed that the infant's eyes were "rolling or jerking"; her tongue "tended to roll up a little bit"; her legs were "very rigid"; and she was unable to bend her legs at the knees. Appellant Susan Middleton told Miller that Natalie had lost some weight and was "sweating a lot." Miller had never seen a baby with this particular set of symptoms before in her experience as a Christian Science nurse. The next day, December 5, Miller noted that there was "nothing new" in Natalie's condition. Up to this point, Miller had spent an hour at appellants' house on each of her visits.

December 6, 1984, was the 12th day of Natalie's illness. When Miller visited appellants' home that day, the child's condition had deteriorated. Natalie was having "what appeared to be heavy convulsions." Miller testified that "[s]he was very rigid, the eyes were really rolling back, and she appeared not responsive." Miller discussed Natalie's condition with appellants, and told them that "the situation was serious." However, she did not suggest that they obtain any medical care for Natalie. Miller changed the baby's diaper and sheets, bathed her, and then "gave silent reading, which is also something Christian Science nurses do." This consisted of silently reading from the Bible and Christian Science scriptures, as well as praying. After Natalie fell into a "restless sleep" around 6:40 p.m., Miller left.

She returned at 8:30 p.m., at appellants' request. Natalie "had awakened to heavy convulsions and she felt very hot to touch." Miller spent that night at appellants' home, alternately sleeping, praying, reading scriptures, and "voicing the truth to the baby." Although Natalie's condition was obviously worse, Miller testified that she never called for a medical doctor to come and assist because "[t]hat wasn't within . . . [the] scope of my job. I was a Christian Science nurse." Early the next morning, after Miller had fed her some milk and water, Natalie again went into convulsions. Miller called the Christian Science practitioner and prayed. After changing the infant's sweat-soaked clothing and bedding, and giving her a sponge bath, Miller left appellants' house. At that time, approximately 7 a.m. on December 7, 1984, Natalie was "resting."

During the remainder of December 7 and all the next day, Miller was busy with other cases. Her Christian Science relief nurse visited Natalie on December 8. When Miller next saw Natalie at 9:30 a.m. on December 9, the infant was dead. Miller informed appellants of this fact and told them that they needed to call the coroner.

Under cross-examination by appellants' attorney, Miller testified that as a Christian Science nurse she never administered medications; her role was "to

provide the practical care to those relying on Christian Science for their healing." Her name was published worldwide in Christian Science publications as an accredited Christian Science nurse. Miller further testified that at that time she was a Christian Scientist herself, that she understood that appellants "were using Christian Science care," and that appellants had consulted a Christian Science practitioner about Natalie's case. She did not relay all of her observations and evaluations of Natalie's symptoms to appellants because in Christian Science "they try to look away from the disease and turn to the higher power," and she was trying to assist appellants "to not see the reality . . . of the physical symptoms but . . . to see the reality of the child being healed and well through the prayers . . . ." Miller further testified that part of her job as a Christian Science nurse was to "evaluate if the parents seemed sincere in applying Christian Science to the situation"; and that appellants' care for Natalie was "consistent with the practices and principles of the Christian Science Religion."

Dr. A. Jay Chapman, an expert in the field of forensic pathology, performed the autopsy on Natalie's body on December 10, 1984, for the County of Sonoma. He determined the cause of death to have been acute purulent meningitis of the brain and spinal cord, brought on by hemophilus influenza bacteria. Dr. Chapman testified that this form of meningitis is susceptible to treatment and cure with penicillin drugs. He estimated that the infection had existed in the infant's body for a week and a half to two weeks, during which time the baby's brain became swollen and softened by the bacterial infection. Dr. Chapman also testified that meningitis is a very painful disease.

The prosecution's third and final witness to testify before the jury was Dr. Michael W. Witwer, a specialist in infectious diseases and an associate clinical professor on the faculty of the University of California San Francisco Medical School. Dr. Witwer had extensive experience in teaching about meningitis, and in treating patients of all ages with the disease. Bacterial meningitis is an extremely serious, life-threatening disease; Dr. Witwer testified that it is the most serious infectious disease known.[1] In young children the symptoms of meningitis are fever, lethargy, irritability, disinterest in feeding, lack of responsiveness and interaction with parents, and then convulsions, seizures, rigidity, arching of the back, rolling of the eyes, and curling, "flopping" or jerking of the tongue. Dr. Witwer testified

---

[1]Meningitis is defined as inflammation of the meninges, the membranes surrounding the brain and spinal column. The infection may be viral or bacterial; bacterial meningitis is generally far more serious and life-threatening than viral meningitis. The infection of the meninges surrounding the brain and spinal column leads to inflammation and swelling of the brain, and resulting pressure against the cranium and damage to the brain itself. Adult patients report that the disease is an "excruciating illness."

that the presence of fever and lethargy in an eight-month-old infant were serious symptoms of infection, calling for medical intervention, the use of antibiotics, and close monitoring for further symptoms.

Although it is much more dangerous than viral meningitis, bacterial meningitis is treatable with antibiotics. Antibiotics to treat bacterial meningitis have been available since the end of the 1930's; by 1984, there were over 20 different antibiotics available. Antibiotics are generally given intravenously to speed absorption of the drugs and to permit much more antibiotic to be introduced into the system. Dr. Witwer described bacterial meningitis in an eight-month-old infant as "eminently treatable," with a survival rate of approximately 92 to 93 percent. Even in a "worst-case scenario," in which treatment did not start until the seventh day of the illness, a baby presenting symptoms such as rolling eyes, jerking tongue, rigidity and convulsions would have an 85 to 90 percent chance of survival; if the infant was deeply comatose and had been deprived of antibiotic treatment for over a week, it would probably have a 50 percent chance of survival. On the other hand, he testified that without treatment, virtually all eight-month-old infants with bacterial meningitis would die.

Following the presentation of evidence by the prosecution, appellants moved for an acquittal pursuant to Penal Code section 1118.1. The trial court denied appellants' motion for acquittal; over appellants' objection, the trial court then granted the prosecution's motion to reopen for the limited purpose of receiving the certificate of death from the County of Sonoma for Natalie Middleton-Rippberger. The trial court also found that Therese Miller was not an accomplice and did not have a duty to Natalie; that Miller did not advise appellants regarding the type of treatment to be given to Natalie; that Miller did not aid and abet the alleged crimes; and that appellants were the parents of Natalie and had care and custody of her.

In their defense, appellants first presented the testimony of two medical experts, Dr. Russell W. Steele, and Dr. Cyril H. Wecht. Dr. Steele, an expert in infectious diseases, testified, on the basis of his review of the autopsy report prepared by Dr. Chapman, that there was insufficient information in the autopsy report to make a judgment as to whether Natalie would have survived her illness if she had received "routine" or "conventional" medical care. Dr. Steele also minimized the pain the infant would have experienced, testifying that the "soft spot" in babies' crania allows more expansion of the inflamed brain than an adult's cranium permits, thereby reducing the pressure from the swelling of the brain. He resisted characterizing the pain she experienced as either moderate or severe. He also confirmed that the symptoms described by Miller as being exhibited by Natalie were symptoms of

meningitis. Dr. Wecht, a pathologist, criticized the preparation of the autopsy report as being incomplete.

Appellants called Professor Samuel S. Hill, a professor of religion at the University of Florida, to testify as an expert on comparative religion in America in general and on the history and teachings of Christian Science in particular. Dr. Hill testified that spiritual healing is "the hallmark" of Christian Science teaching, central and crucial to its very identity; and that conventional health care is "incompatible" with Christian Science teaching and practice. According to Dr. Hill, "to turn your back on the teaching and practice of spiritual healing would be to betray your faith, to cut the heart out of Christian Science." Christian Scientists believe that pain, illness and disease are not "real," but instead arise from an erroneous misunderstanding of the true spiritual nature of reality; illness must therefore be overcome by prayer, scriptural reading and meditation to gain a better understanding of and reliance on the truth. Dr. Hill expressed the opinion that appellants' response to Natalie's illness was entirely consistent with Christian Science.

Appellants offered evidence that under the United States Internal Revenue Code, payments to Christian Science practitioners and nurses are recognized and deductible as medical expenses. They also introduced testimony by Dr. Ralph L. Green, an obstetrician-gynecologist, who assisted in the delivery of appellants' children. He gave evidence that although appellants used his services to assist in the birth of their children, this was done in compliance with the law, and subject to special limitations imposed by appellants that no medications be used, consistent with their Christian Science beliefs.

Next, appellants offered the testimony of Dr. Thomas Szasz, a psychiatrist, for the stated purpose of explaining to the jury the differing manners in which different individuals perceive illness, depending on their religious beliefs and life experience. The trial court excluded this proffered testimony pursuant to Evidence Code section 352. Appellants also sought to introduce into evidence a written compendium of federal and state statutes and regulations recognizing Christian Science as an alternative to medical care, together with the testimony of Cheryl E. Michaelson, the attorney who prepared the compendium. This evidence and testimony was also excluded by the trial court, again pursuant to Evidence Code section 352.

Appellants' case concluded with extensive testimony by appellant Mark Rippberger. Rippberger testified that at all times relevant to this case, he and his family were living "just outside of Healdsburg." Rippberger testified that he and his wife were both life-long Christian Scientists; that his father was

an authorized Christian Science teacher; and that he had received extensive training in Christian Science teachings and practice both in his home and, from the age of two, in Sunday school. He also testified that in his understanding, the practice of Christian Science was not compatible with the use of medicine; that in joining the church, he made a commitment that he would rely solely on Christian Science practices for healing; and that as a result, he had conscientiously avoided learning about disease or illness all his life. His parents never had any medicines in the house while he was growing up, and he had personally never been to a medical doctor or used medicines for the healing of any illness or disease; he had always found Christian Science methods of healing to be sufficient and successful. He had taken advantage of all available health exemptions to insure that his children would not be immunized against communicable diseases, and would not have their vision checked at school. He had never taken his children to a doctor or a dentist, and did not own a thermometer for measuring fever.

On the other hand, he had on two occasions personally undergone physical examinations, including blood pressure tests and urine analysis, to satisfy school or job requirements; and, as a child, he had visited a dentist and had three fillings in his teeth. However, he now preferred to rely on spiritual means to treat any dental problems. In order to comply with legal requirements, his wife had utilized the services of an obstetrician for the births of their four children, with the stipulation that no medications be used.

Regarding Natalie's illness, Rippberger testified that he utilized a Christian Science practitioner and nurses to assist him and his family in giving spiritual treatment to Natalie; that although he was very concerned with Natalie's evident discomfort and apparent illness, it never occurred to him to consider seeking medical care for his daughter; that throughout her illness he regarded it as just a cold or flu; and that up to the moment of her death, he fully expected her to recover. Nevertheless, he did consult with the Christian Science Church Committee on Publication, which was standard procedure when children were ill and not responding to Christian Science treatment.

Rippberger conceded that although he possessed a loose-leaf handbook entitled the "Legal Rights and Obligations of Christian Scientists," he had not kept it updated since 1980. Although his own copy listed meningitis as a communicable disease which was to be reported to the local health department, he had no way of knowing what the symptoms of meningitis were during Natalie's illness, never even having heard of the disease at that time.

The jury thereafter found appellants guilty of felony child endangerment, but not guilty of involuntary manslaughter. The trial court suspended

imposition of sentence and appellants were placed on formal probation for a period of five years. Among the terms of their probation were completion of a class in family health; reporting to the probation officer any illness of one of their children lasting over 24 hours; reporting to the probation officer any use of a Christian Science practitioner for one of the children; and authorization of emergency medical treatment or care for any life-threatening illness or injury suffered by a minor child.

## II

### SUFFICIENCY OF THE EVIDENCE

 Appellants' initial argument on appeal is that the trial court improperly denied their motions for acquittal because the prosecution had failed to provide substantial evidence that appellants had denied their child medical care. We disagree.

 The standard of review governing judicial review of a criminal conviction challenged as lacking evidentiary support has been expressed by the Supreme Court as follows: "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]" (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

In reaffirming this position the court stated that it "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

 Even if we consider only the evidence adduced in the prosecution's case, *prior to appellants'* initial motion for acquittal, there was substantial evidence before the trial court at that time to support the denial of that

motion. Dr. Chapman, the pathologist who performed the autopsy on Natalie's body for the County of Sonoma, testified that Natalie died of acute bacterial meningitis of the brain and spinal cord, a disease readily treatable and curable with the use of ordinary penicillin drugs. The disease, an extremely painful one, had existed in the infant's body for a week and a half to two weeks.

Dr. Witwer, a specialist in infectious diseases and an expert on meningitis, testified to the symptoms of meningitis in young children. These symptoms —including fever, lethargy, irritability, disinterest in feeding, lack of responsiveness and interaction with parents, convulsions, rigidity, arching of the back, rolling of the eyes, and curling or jerking of the tongue—all precisely matched the symptoms observed by Miller, the Christian Science nurse. Dr. Witwer testified that the presence of fever and lethargy alone in an eight-month-old infant, much less the very extreme symptoms presented by Natalie and observed by Miller, were very serious signs of infection, calling for immediate medical intervention, the use of antibiotics, and close monitoring for further symptoms.

Like Dr. Chapman, Witwer also testified to the fact that bacterial meningitis is treatable with antibiotics, and has been for over 50 years. The evidence showed a survival rate for bacterial meningitis in an eight-month-old infant of 92 to 93 percent. Even if this case were viewed as a "worst-case scenario" in that treatment might not have been started until the seventh day of the illness, at a time when she was exhibiting the symptoms described by Miller, Witwer's testimony would support the rational conclusion that Natalie would have had at least an 85 to 90 percent chance of survival. On the other hand, the evidence showed that without treatment, virtually all eight-month-old infants stricken with bacterial meningitis will die.

Miller's testimony, which we will not repeat here, provided more than ample evidence to establish appellants' practices as Christian Scientists and their failure to employ or seek any standard medical intervention to save Natalie's life, despite the severity of her symptoms. The evidence was overwhelming that appellants elected to provide only spiritual assistance to their daughter during her fatal illness, in lieu of giving her medical care; that appellants intentionally denied Natalie medical care, despite the steady deterioration in her physical condition; that Natalie suffered from a disease readily cured by the application of standard antibiotic treatment; that in all probability she would have survived had she been given medical treatment; and that her death was the direct result of appellants' failure to give her any medical attention, treatment or care.

## III

### Evidence of Willful Conduct

■ Appellants also separately challenge the trial court's denial of their motions for acquittal on the grounds that there was no evidence of willful conduct on their part.

Contrary to appellants' position, the crime of felony child endangerment does not require proof by the prosecution of any subjective knowledge on the part of defendants that their actions were not helping or were deleterious to the child; nor is it any defense to the crime that appellants may have been sincere in their good faith belief that what they were doing was in the child's best interests. Although Penal Code section 273a, subdivision (1), does use the word "willfully," the crime described is one of criminal negligence and not of malice or specific intent. (*People* v. *Pointer* (1984) 151 Cal.App.3d 1128, 1134 [199 Cal.Rptr. 357]; *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 46-49 [119 Cal.Rptr. 780].)

■ A finding of criminal negligence is made by the application of the *objective* test of whether a reasonable person in the defendant's position would have been aware of the risk involved. If the trier of fact determines that, on an objective analysis, a reasonable person in that position would have been aware of the risk, then the defendant is *presumed* to have had such an awareness. (*People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279].) Criminal negligence may be found even when a defendant acts with a sincere good faith belief that his or her actions pose no risk. As long as the trier of fact determines that the defendant was *unreasonable* in that belief, the defendant's actual subjective belief is irrelevant. ■ The California Supreme Court has recently reiterated, in a case directly on point, that a sincere belief in the efficacy of Christian Science spiritual healing practices is not a defense to a charge of criminal negligence; and that "[t]he relevant inquiry . . . turns not on [a] defendant's subjective intent to heal . . . but on the objective reasonableness of her [or his] course of conduct." (*Walker, supra,* 47 Cal.3d at p. 137, fn. omitted.)[2]

---

[2]The defendant in *Walker* was charged with involuntary manslaughter and felony child endangerment for the death of her daughter from meningitis. Like appellants in this case, the *Walker* defendant was a committed Christian Scientist who had treated her child's illness with prayer rather than medical care. After 17 days of illness, the child died. On a petition for review of the denial by the Court of Appeal of defendant's petition for a writ of prohibition, the Supreme Court rejected the defendant's contentions that her conduct was protected by law, and held that she could be prosecuted as charged. (*Walker, supra,* 47 Cal.3d at pp. 118-120.)

On the specific issue of whether a reliance on Christian Science prayer treatment under circumstances such as those presented here can constitute criminal negligence as a matter of

In the case at bench, the evidence submitted in both the prosecution and defense cases was overwhelming that the infant was suffering an extremely serious disease, with persistent fever, convulsions, rigidity, rolling of eyes, and other symptoms of life-threatening illness. Appellants were told by their Christian Science nurse of the seriousness of Natalie's condition; although in keeping with her role as a Christian Science nurse, Miller did not emphasize this fact, she did recommend that appellants notify the legal arm of the Christian Science Church to ascertain their obligations. Appellant Rippberger's own testimony of his deliberate ignorance of diseases, symptoms, and medical treatment furnished strong evidence of parental failure to discharge legally imposed duties of care to his children. The testimony of Dr. Chapman and Dr. Witwer provided evidence of the effectiveness of commonly available antibiotics to treat meningitis, and of the extremely high incidence of cure where medical intervention is sought in cases like Natalie's. In short, the trial court properly denied appellants' motions for acquittal.

## IV

### TESTIMONY OF AN ACCOMPLICE

Appellants' next contention is that the trial court erred in finding that Therese Miller was not an accomplice to the crimes charged. They urge that, assuming she is an accomplice, her testimony was not corroborated, and therefore may not be considered in support of appellants' conviction.

On their initial motion for acquittal made at the close of the prosecution case, appellants urged the trial court to discount the testimony of Miller as an uncorroborated accomplice to the charged offenses. The trial court refused,

law, the Supreme Court stated: "Emphasizing her sincere concern and good faith in treating [her daughter] with prayer, [the defendant] claims that her conduct is incompatible with the required degree of culpability. Defendant does not dispute, however, that criminal negligence must be evaluated objectively. [Citations.] The question is whether 'a reasonable person in defendant's position would have been aware of the risk involved . . . .' [Citation.] If so, 'defendant is presumed to have had such an awareness.' [Citation.]

". . . The relevant inquiry . . . turns not on defendant's subjective intent to heal her daughter but on the objective reasonableness of her course of conduct.

"In view of this standard, we must reject defendant's assertion that no reasonable jury could characterize her conduct as criminally negligent for purposes of [Penal Code] sections 192(b) and 273a(1). . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"In sum, we reject the proposition that the provision of prayer alone to a seriously ill child cannot constitute criminal negligence as a matter of law. Whether this defendant's particular conduct was sufficiently culpable to justify conviction of involuntary manslaughter and felony child endangerment remains a question in the exclusive province of the jury." (*Id.*, at pp. 136-138, fn. omitted.)

finding instead that Miller was not an accomplice as defined by Penal Code section 1111 under the evidence in the record at that time. The trial court based this ruling on its finding that, unlike appellants, Miller had no duty to provide medical care outside the scope of her training and profession as a Christian Science nurse, and that she had not aided, abetted, advised or encouraged appellants in their failure to obtain medical care for Natalie.

At the conclusion of the trial the jury was instructed to determine if Miller was an accomplice, and was further instructed on the law in respect to an accomplice as provided in Penal Code section 1111.

■■■ Under California statutory law, a conviction may not be based on the testimony of an accomplice unless that testimony is corroborated by independent evidence connecting the defendant to the charged offense.[3] A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1208 [249 Cal.Rptr. 71, 756 P.2d 795].) ■■■ It is indisputable that Miller's testimony was fully and adequately corroborated by the testimony of appellant Rippberger himself. Nevertheless, appellants contend that, as a matter of law, the trial court erred in refusing to grant their acquittal motion at the close of the prosecution case, because at that point in the trial, the People's case rested on Miller's uncorroborated accomplice testimony.

■■■ Although corroborative evidence must, in some way, tend to connect the defendant directly with the commission of the crime and may not merely raise a suspicion of guilt, it is nonetheless well established that a broad spectrum of evidence, both direct and circumstantial, will qualify as corroborative. Thus, the corroboration need not extend to all elements of the charged offense, nor to every fact and detail contained in the testimony of the accomplice. The evidence need not be particularly strong; it is sufficient if it tends, in some slight degree, to implicate the defendant. Circumstantial evidence is sufficient as long as the connection of the defendant with the charged offense may be reasonably inferred therefrom. In short, corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the finder of fact that the

---

[3]Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

accomplice is telling the truth. (*People* v. *Bunyard, supra,* 45 Cal.3d at pp. 1206-1207; *People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Bowley* (1964) 230 Cal.App.2d 269, 271 [40 Cal.Rptr. 859]; *People* v. *Singer* (1963) 217 Cal.App.2d 743, 753 [32 Cal.Rptr. 701]; *People* v. *Griffin* (1950) 98 Cal.App.2d 1, 25 [219 P.2d 519]; 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1765, pp. 1719-1720.)

▮▮▮ Here, it is unnecessary for us to decide whether the trial court was in error in finding that Miller was not an accomplice, because we find adequate corroboration for her testimony in the record of the trial prior to the defense presenting its case. Appellants stipulated that Natalie was their child, and that she died at their home on December 9, 1984. The certificate of death, admitted into evidence by the trial court upon the prosecution's motion to reopen and of which we take judicial notice, established that appellants lived at the same address with Natalie. Dr. Chapman testified on the basis of his autopsy that the infant had been sick for approximately two weeks. On the basis of this evidence, a reasonable jury could infer that appellants, as the child's parents, were present at their home during this illness and could have taken action on her behalf.

Further, Dr. Chapman testified that Natalie's death was attributable to acute purulent bacterial meningitis. Both he and Dr. Witwer gave extensive testimony establishing that this disease was readily susceptible to treatment by standard antibiotics, and had been for over 50 years. Dr. Witwer testified on the basis of his expertise and extensive experience in treating meningitis that 92 to 93 percent of children survive bacterial meningitis if medically treated, while virtually all infants of Natalie's age will perish of the disease if denied medical care. This evidence supports a reasonable inference that medical treatment was not provided to Natalie.

Finally, Dr. Witwer's testimony regarding the symptoms of meningitis in small children—the lethargy, fever, lack of eye contact or interaction, rolling of the eyes, irritability, lack of appetite, tongue spasms, rigidity and convulsions—precisely matched and corroborated Miller's testimony regarding the symptoms that she observed in Natalie. The jury could reasonably infer that these symptoms, seen in an eight-month-old infant over a two-week period, would place a reasonable person on notice that the child could be suffering from a serious and life-threatening illness, and needed prompt medical attention.

▮▮▮ " 'Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his [or her] credibility [citation omitted].' [Citation.]" (*People* v. *Bunyard, supra,* 45 Cal.3d at pp.

1206-1207, fn. omitted.) Here, the combination of the medical testimony, the death certificate, and the stipulation in this case was sufficient to corroborate Miller's testimony, even if she was an accomplice.

## V

### JURISDICTION

■ Next, appellants argue that the prosecution failed to establish jurisdiction in the Sonoma County Superior Court. This contention is without merit.

Appellants' argument on this point focuses on their insistence that nothing in the prosecution's case established that Natalie actually died in the County of Sonoma. The evidence in the record is overwhelmingly to the contrary. Miller testified that she visited Natalie and her parents during the infant's illness at their home "outside the City of Healdsburg in a rather rural setting." She was not sure of the precise address, but believed that it was Dry Creek Road. The death certificate showed that appellants' lived at 2651 Westside Road in Healdsburg. A map of Sonoma County, of which we have taken judicial notice, shows that both Dry Creek Road and Westside Road are near Healdsburg. Moreover, the autopsy was performed in Sonoma County by the forensic pathologist under contract to perform autopsy on behalf of that county.

All this evidence provides convincing substantiation for the prosecution's contention that Natalie died in the County of Sonoma, and supports venue in the superior court of that county. There was no error on the part of the trial court in rejecting appellants' position in this regard. (*People* v. *Price* (1989) 210 Cal.App.3d 1183, 1190 [259 Cal.Rptr. 282]; *People* v. *Kutz* (1960) 187 Cal.App.2d 431, 434 [9 Cal.Rptr. 626].)

## VI

### STATUTORY INTERPRETATION

■ Appellants claim that certain amendments to Penal Code section 270, made with the evident intention of protecting Christian Scientists from prosecution for failure to provide necessities of life to their minor children, constitute a defense to the prosecution brought against them in this case. Appellants' position was correctly rejected by the trial court.

Penal Code section 270 imposes on parents the duty to furnish their minor children with "necessary clothing, food, shelter or medical attendance, or

other remedial care," and defines the willful and unexcused failure to do so as a misdemeanor. In 1976, the statute was amended to include the following exemption: "If a parent provides a minor with treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination, by a duly accredited practitioner thereof, such treatment shall constitute 'other remedial care,' as used in this section." (Stats. 1976, ch. 673, § 1, pp. 1661-1662.) Appellants urge that this language in Penal Code section 270 also serves to bar prosecutions of felony child endangerment under Penal Code section 273a, subdivision (1).

Appellants' contention has recently been considered and rejected by the California Supreme Court. In *Walker, supra*, 47 Cal.3d 112, the state's high court held that this paragraph was intended only to create a limited exemption from the requirements of Penal Code section 270 for parents providing treatment by prayer to their children. On the other hand, compliance with the terms of that statute does not absolve parents from potential liability under other provisions of the Penal Code. In short, there is no parallel exemption for spiritual healing methods under the provisions covering involuntary manslaughter (Pen. Code, § 192, subd. (b)) and felony child endangerment (Pen. Code, § 273a, subd. (1)).[4]

Nevertheless, appellants insist that this court should reexamine this issue. They urge that they provided the trial court below with "new factual information" to show that the Legislature did intend for the amendment to Penal Code section 270 to bar prosecutions for felony child endangerment. As evidence of this purported legislative intent they offer declarations made in June 1989 by former Governor Edmund G. Brown, Jr., former Senate Minority Leader Dennis Carpenter, a "Legislative intent expert," and a Christian Science Church official.

---

[4]The Supreme Court stated: "While certainly reflecting concern for the general welfare of children, the fiscal objectives of this support provision are so manifestly distinguishable from the specific purposes of the involuntary manslaughter and felony child-endangerment statutes—designed to protect citizens from immediate and grievous bodily harm—that [Penal Code] section 270 cannot be read to create express exemptions from prosecution under those separate provisions as a matter of parallel construction. The Legislature has determined that the provision of prayer is sufficient to avert misdemeanor liability for neglecting one's financial responsibility to furnish routine child support. This hardly compels the conclusion that in so doing the Legislature intended to create an unqualified defense to felony manslaughter and child endangerment charges for those parents who continue to furnish prayer alone in the rare instance when a gravely ill child lies dying for want of medical attention." (*Walker, supra*, 47 Cal.3d at p. 126, fn. omitted.) After reviewing the language, purposes, and legislative history of Penal Code section 270, the court concluded that there was no "discernible legislative intent to exempt prayer treatment, as a matter of law, from the reach of the manslaughter and felony child-endangerment statutes." (*Id.*, at p. 129.)

We are unpersuaded by appellants' proffered "new" evidence that *Walker* was wrongly decided; much less are we persuaded that we could ignore its holding in any event. First, we note that the declarations were made some thirteen years after the subject amendment was enacted. Moreover, the *Walker* court undertook an exhaustive examination of the legislative intent question. It would appear from the record that the materials relied upon by the declarants in the instant case were before the Supreme Court in the *Walker* case. ■■■ The principle of stare decisis is not a discretionary doctrine for the Courts of Appeal, with respect to decisions of the California Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) ■■■ The decision in *Walker* was handed down in November 1988. In the succeeding two years, the Legislature has not seen fit to counter this ruling. Additionally, we find the logic of the decision to be irrefutable. We cannot accept the proposition that the Legislature intended to carve out an exception that would permit a small segment of our society, with impunity, to endanger the lives of infants who are helpless to act on their own behalf.

## VII

### FREE EXERCISE OF RELIGION

■■■ Next, appellants contend that their prosecution under the California Penal Code provisions on involuntary manslaughter and felony child endangerment was unconstitutional under the free exercise of religion clause of the First Amendment of the United States Constitution. They argue that because "[r]esort to conventional medical care constitutes an admission that illness is 'real,'" contrary to "the most central belief" of Christian Science that "illness is not 'real,'" any effort by the state to force Christian Science parents such as appellants to provide medical care for their children will inevitably result in the destruction of the religion of Christian Science itself.

This issue has been addressed and decided adversely to appellants' position by our Supreme Court in *Walker, supra,* 47 Cal.3d at pages 138-141. The court determined that the state's interest in protecting and preserving the lives and health of children was compelling enough to justify the inevitable infringement on Christian Science beliefs. "Regardless of the severity of the religious imposition, the governmental interest is plainly adequate to justify its restrictive effect. As the United States Supreme Court stated in *Prince* v. *Massachusetts* [(1944) 321 U.S. 158] at page 170 [88 L.Ed. 645, 654, 64 S.Ct. 438], 'Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full legal discretion when they

can make that choice for themselves.' . . . As the court explained, 'The right to practice religion freely does not include liberty to expose the community or child to communicable disease or the latter to ill health or death.' (*Id.*, at pp. 166-167; [88 L.Ed.2d at p. 653]; accord 35, *Wisconsin v. Yoder* [(1972) 406 U.S. 205] at pp. 233-234 [32 L.Ed.2d 15, 35, 92 S.Ct. 1526].)" (*Walker*, *supra*, 47 Cal.3d at pp. 139-140.) We join in this view. Free exercise of religion is not an absolute right and must be balanced against the rights of others, including one's children. It would be denigrating to the First Amendment if parents could use it as a shield to justify conduct which is life-threatening to an offspring.

### VIII-X*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### XI

### ADMISSIBILITY OF EVIDENCE

■ Appellants maintain that the trial court erred in excluding the testimony of Cheryl Michaelson and in not admitting into evidence the compendium she had prepared of statutes and regulations of the federal government and our 50 states relating to Christian Science health practices. The argument is meritless.

The proffered evidence was properly excludable on a variety of grounds. In the first place, the California Supreme Court in *Walker* has already considered a broad spectrum of statutes dealing with Christian Science practitioners in a variety of contexts; it concluded that despite widespread recognition of the rights of Christian Scientists who wish to rely on spiritual treatment for their own care, the Legislature had clearly manifested its intent that "when a child's health is seriously jeopardized, the right of a parent to rely exclusively on prayer must yield." (*Walker, supra*, 47 Cal.3d at p. 133.) "The legislative design appears consistent: prayer treatment will be accommodated as an acceptable means of attending to the needs of a child only insofar as serious physical harm or illness is not at risk. When a child's life is placed in danger, we discern no intent to shield parents from the chastening prospect of felony liability." (*Id.*, at p. 134.)

Additionally, the argument of the appellants reflects a lack of understanding of the role of the participants in a jury trial. The jury is the trier of fact. It is the duty of the trial judge to instruct the jury on the law to be applied in

---

*See footnote, *ante*, page 1667.

the case. The court may find certain statutory enactments within a compendium persuasive in arriving at the instructions to be given to the jury. It would be inappropriate, however, for the jury on its own to determine the applicable law by interpreting literally hundreds of statutes and regulations from around the nation.

The trial court was well within its discretion in excluding this evidence under Evidence Code section 352. It is clear to us that its introduction would have resulted in a greatly increased consumption of time and the likelihood of confusing and misleading the jury, with very little compensating probative value.

## XII

Finally, appellants argue that the testimony of Therese Miller should have been excluded because it was the fruit of an illegal interrogation. Specifically, they rely on the fact that the police learned of Miller's identity as appellants' Christian Science nurse in the course of interviews with appellants, without *Miranda* warnings [*Miranda* v. *Arizona* (1966) 384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)], which took place at the Healdsburg Police Department.

Appellants' position is unpersuasive. The evidence in the record shows that appellants voluntarily attended the interviews, driving themselves to and from the police station. At the commencement of each interview, the police officers expressly stated that appellants were not under arrest, that they were free to leave at any time, and that they could terminate the interviews at any time if they so desired. There was no evidence that the doors were locked or that appellants thought that they were locked. There were no restraints on appellants, and no demands by the officers that they appear, stay, or give information. On the basis of this evidence, the trial court reasonably concluded that these interviews were not custodial interrogations.

Even if we were to assume that Miller's identity came to light as the result of an illegal custodial interrogation, the evidence amply demonstrates that her testimony would have been procured in any event by lawful means. Miller's name was listed in Christian Science publications as the one Christian Science nurse in Santa Rosa. The police already knew from the coroner's office that appellants had used a Christian Science practitioner in Natalie's illness. It seems certain that the police would have identified and located Miller as a potential witness without the use of the information gained from the challenged interviews with appellants. Thus, Miller's

identity and testimony are admissible under the doctrine of "inevitable discovery." (*Nix* v. *Williams* (1984) 467 U.S. 431, 444-450 [81 L.Ed.2d 377, 387-392, 104 S.Ct. 2501]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 277-278 [256 Cal.Rptr. 96, 768 P.2d 610].)

## XIII

### DISPOSITION

The judgment is affirmed.

White, P. J., and Strankman, J., concurred.