[No. A075825. First Dist., Div. Four. Nov. 19, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN EDWARD HANSEN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.-VIII.

**COUNSEL**

Deborah Adams, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen

and Raymond A. Cardozo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REARDON, J.**—Defendant and appellant John Edward Hansen (appellant) was charged in count one with felony child endangerment (Pen. Code,[1] § 273a, subd. (a)) while armed with a firearm (§ 12022, subd. (a)(1)) which resulted in death (§ 12022.95). Count two charged involuntary manslaughter (§ 192, subd. (b)) while armed with a firearm (§ 12022, subd. (a)(1)). A jury found appellant guilty as charged and alleged. The trial court sentenced him to state prison for six years.

Appellant contends that the convictions are not supported by substantial evidence, the instructions were inaccurate and the sentence is improper. We affirm.

## I. STATEMENT OF THE FACTS

On December 14, 1995, Jason Campbell, the 14-year-old-victim, was killed by a shot from a .357-caliber Magnum revolver discharged at or near the surface of the skin into his right temple. The events surrounding the death of Jason were observed by appellant and three teenage eyewitnesses: Alicia T., Johnny M. and Eric B.[2] December 14, 1995, was one week before appellant's thirty-fifth birthday. He lived with his girlfriend and her three children. At the time of the shooting, Alicia and Eric were staying at appellant's residence. Jason was a close neighbor and resided with his mother. The teenagers were friends with each other. Before the date of the shooting, appellant had "hung out" with Jason, Eric and Johnny.

Around 10:30 p.m. on December 14, 1995, appellant, Jason and the eyewitnesses were sitting in appellant's small living room. No one else was present. All were close together and a television was playing. Appellant was noticeably intoxicated. None of the others appeared to be intoxicated.

Alicia, Johnny and Eric testified that appellant removed a .357-caliber Magnum Ruger revolver from his jacket, placed the muzzle at his head and pulled the trigger one to four times. The gun, which held six rounds, clicked without firing. Alicia also noticed appellant clumsily load and unload the

---

[1]All further statutory references are to the Penal Code.

[2]The victim and two of the eyewitnesses are minors. We will not use last names for any of the eyewitnesses.

revolver. Four bullets removed from the gun were picked up by Alicia. Subsequently she threw them down a storm drain.

Alicia and Johnny heard appellant state something to the effect of would you like to play "Russian roulette," directed at the group generally. Eric heard appellant mention Russian roulette to Jason and someone asked if Eric wanted to play. A comment was made that two bullets remained in the revolver. Eric stated that he would not play Russian roulette with two out of six chances. No eyewitness could positively certify the exact number of bullets in the revolver, but each believed that at all material times at least one live round was present. Jason stated, " 'Don't take the easy way out' " or " 'That's a sucker's way to go out.' " Johnny also made the former comment.

The next person to hold the .357-caliber Magnum was Jason. Appellant handed it to him either at the request of Jason or on appellant's own initiative. Jason attempted to pass the gun to Johnny. When Johnny refused, Jason stated: " 'Don't be a chicken.' " Eric requested the gun. Jason asked appellant if he should give the gun to Eric and appellant stated no. Jason asked Eric, " 'How can you pull the trigger without making the gun go off?' " Eric explained and demonstrated with his hands how to do so. Jason carried out the procedure and handed the gun back to appellant.

Alicia observed appellant put the gun to his head, spin the barrel, pull the trigger two or three times and mention Russian roulette. The weapon clicked without firing. Johnny observed the same actions but he heard appellant again state to the group, " 'Let's play some Russian roulette.' " Eric turned his attention to the television and did not continue to watch appellant or Jason. At this point in time, Alicia, Eric and Johnny prepared to leave appellant's residence. They were going for hot chocolate and marshmallows at Jason's house. Jason was expected to join them.

As Alicia was tying her shoes, she saw Jason standing face-to-face with appellant about four inches apart. Alicia could determine that Jason and appellant were talking but she did not hear the actual words. Jason put the muzzle of the gun against his head. Alicia heard a loud noise and saw a flash. She looked toward Jason and appellant. Jason was lying up against a speaker. Appellant jumped up, threw his arms down and stated, " 'shit.' " Johnny was heading to the bathroom when he heard a gunshot, turned and saw Jason lying on the ground. Eric saw Jason holding the gun which was pointed downward. Then Eric went to the kitchen to light a cigarette and heard the gun go off. Turning toward Jason, Eric observed the flash of a gun and "Jason's eyes sticking out." Appellant and the three witnesses ran out of appellant's residence.

When the police were summoned after the shooting, they discovered two live bullets in appellant's residence. One spent cartridge was found inside the .357-caliber revolver. There were two bullets in Jason's pocket which would not fit in the revolver.

The defense presented witnesses who testified that Jason was mature for his age. Appellant and his girlfriend testified that appellant was carrying the handgun for protection because of threats to them. Due to intoxication appellant did not remember much of the circumstances of the shooting. His best recollection was that he emptied the gun and placed it to his head. The next memory is Jason shooting himself in the head. At no time did appellant mention Russian roulette. When someone else referred to Russian roulette, "almost like automatic" appellant put the gun to his own head and pulled the trigger.

## II. SUBSTANTIAL EVIDENCE AND INTERVENING CAUSE

■ Appellant contends that the evidence was insufficient to support verdicts of child endangerment and involuntary manslaughter, or at minimum required an instruction on independent intervening cause. These contentions lack merit.

Section 273a, subdivision (a) provides that felony child endangerment occurs when: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . ."

■ "Although Penal Code section 273a . . . does use the word 'willfully,' the crime described is one of criminal negligence and not of malice or specific intent. [Citations.] [¶] A finding of criminal negligence is made by the application of the *objective* test of whether a reasonable person in the defendant's position would have been aware of the risk involved. . . . [Citation.] Criminal negligence may be found even when a defendant acts with a sincere good faith belief that his or her actions pose no risk." (*People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1682 [283 Cal.Rptr. 111], original italics.) Involuntary manslaughter may also result from criminal negligence. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 522, pp. 590-591.)

"Criminal negligence 'means that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due

care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life.' [Citation.]" (*People* v. *Odom* (1991) 226 Cal.App.3d 1028, 1032 [277 Cal.Rptr. 265].)

■ "The principles of causation apply to crimes as well as torts. [Citation.]" (*People* v. *Schmies* (1996) 44 Cal.App.4th 38, 46 [51 Cal.Rptr.2d 185].) "It is, therefore, clear that a defendant may be liable for [criminal homicide] for a killing when his acts were the 'proximate cause' of the death of the victim, even though he did not administer the fatal wound." (*People* v. *Gardner* (1995) 37 Cal.App.4th 473, 479 [43 Cal.Rptr.2d 603].) "Thus, in homicide cases, a 'cause of the [death of the victim] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.' [Citations.]" (*People* v. *Schmies, supra*, 44 Cal.App.4th at p. 48, first bracketed insertion added.)

" '. . . [N]egligence on the part of the victim is not a defense to criminal liability. . . . [¶] A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability. . . . "(1) The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. (2) The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act." . . .' . . ." (*People* v. *Pike* (1988) 197 Cal.App.3d 732, 749 [243 Cal.Rptr. 54], citations omitted.)

"Thus, it is only an unforeseeable intervening cause, an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause. [Citations.]" (*People* v. *Armitage* (1987) 194 Cal.App.3d 405, 420-421 [239 Cal.Rptr. 515].)

■ Violations of section 273a, subdivision (a) can occur in a wide variety of situations. (*People* v. *Smith* (1984) 35 Cal.3d 798, 806 [201 Cal.Rptr. 311, 678 P.2d 886].) "The number and kind of situations where a child's life or health may be imperiled are infinite. . . . Thus, reasonably construed, the statute condemned the intentional placing of a child, or permitting him or her to be placed, in a situation in which serious physical danger or health hazard to the child is reasonably foreseeable." (*People* v. *Deskin* (1992) 10 Cal.App.4th 1397, 1402 [13 Cal.Rptr.2d 391].) Storing

loaded firearms in a home occupied by children without denying the children access to the weapons creates a potential peril under the statute. (*People* v. *Odom, supra*, 226 Cal.App.3d at p. 1033.)

In *Tison* v. *Arizona* (1987) 481 U.S. 137 [107 S.Ct. 1676, 95 L.Ed.2d 127], the United States Supreme Court cites the Model Penal Code, which refers to "*shooting a person in the course of playing Russian roulette*" as an example of acting " 'reckless[ly] under circumstances manifesting extreme indifference to the value of human life.' " (*Id.* at p. 169, fn. 8 [107 S.Ct. at p. 1694].) California courts have described Russian roulette as "conduct . . . beyond reason" (*Leffler* v. *Workers' Comp. Appeals Bd.* (1981) 124 Cal.App.3d 739, 744 [177 Cal.Rptr. 552]) and " 'a bizarre pass-time . . . courting death or severe injury' " (*People* v. *Sandoval* (1963) 222 Cal.App.2d 348, 352 [35 Cal.Rptr. 227]).

Courts of other states have applied endangerment or homicide statutes to situations where the defendants and victim were engaged in Russian roulette and the victim shot himself.

*Minor* v. *State* (1992) 326 Md. 436 [605 A.2d 138], involved a Maryland statute providing that ". . . [A]ny person who [¶] 'recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty . . . .' " (*Ibid.*) After being found guilty in a trial by the court, defendant contended that ". . . the victim's act of pulling the trigger was a voluntary act of suicide that was unanticipated and, therefore, the evidence did not show that his conduct was reckless . . . ." (*Id.* at p. 140.) The Maryland Court of Appeals rejected the contention and held that participation in Russian roulette was substantial evidence that defendant committed the offense. (*Id.* at pp. 141-142.)

In *Commonwealth* v. *Atencio* (1963) 345 Mass. 627 [189 N.E.2d 223], the Supreme Judicial Court of Massachusetts affirmed a jury verdict and conviction of involuntary manslaughter for two defendants as follows: "Here the Commonwealth had an interest that the deceased should not be killed by the wanton or reckless conduct of himself and others. [Citation.] Such conduct could be found in the concerted action and cooperation of the defendants in helping to bring about the deceased's foolish act. . . . [¶] . . . The testimony does not require a ruling that when the deceased took the gun from [defendant] Atencio it was an independent or intervening act not standing in any relation to the defendants' acts which would render what he did imputable to them. . . . There could be found to be a mutual encouragement in a joint enterprise. In the abstract, there may have been no duty on the defendants to prevent the deceased from playing. But there was a duty on

their part not to cooperate or join with him in the 'game.' " (*Id.* at pp. 224-225.)

*Lewis* v. *State* (Ala.Crim.App. 1985) 474 So.2d 766, involved a conviction, by a jury, of criminally negligent homicide where the 15-year-old victim shot himself while alone after the Russian roulette had concluded. The Alabama Court of Criminal Appeals reversed as follows: "A determination as to whether the conduct of a person caused the suicide of another must necessarily include an examination of the victim's free will. Cases have consistently held that the 'free will of the victim is seen as an intervening cause which . . . breaks the chain of causation.' [Citation.] Therefore, the crux of this issue is whether the victim exercised his own free will when he got the gun, loaded it and shot himself. We hold that the victim's conduct was a supervening, intervening cause sufficient to break the chain of causation. [¶] . . . [W]e cannot say that the appellant should have perceived the risk that the victim would play the game by himself or that he intended for him to do this." (*Id.* at p. 771.)

However, the Alabama court also stated, as explanation of its holding: "If the victim had shot himself while he and the appellant were playing Russian Roulette, or if the appellant was present when the victim was playing the game by himself, the appellant's conduct of influencing the victim to play would have been the cause-in-fact and the proximate cause of the victim's death. However, the key is the appellant's presence at the time the victim shot himself. [Citation.] . . . [¶] It also seems clear that the appellant would be responsible for the victim's death if he had left the room while the victim was still playing the game because he should have perceived the result. But, the evidence reveals that the appellant had put the gun away after they finished playing the 'game.' " (*Lewis* v. *State, supra,* 474 So.2d at p. 771.)

We find the decisions and reasoning of the Maryland, Massachusetts and Alabama courts to be consistent with the California cases and quite persuasive. Construing the instant record most favorably to the judgment, as we must in accordance with the substantial evidence rule, the key facts are that appellant initiated Russian roulette, encouraged the victim to participate and was present when the victim shot himself while engaged in Russian roulette. ■ Appellant argues that the evidence leaves open other possibilities, but under the governing rule: "It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People* v. *Brown* (1984) 150 Cal.App.3d 968, 970 [198 Cal.Rptr. 260].) ■ The actions and words of appellant regarding Russian roulette establish that he acted in a criminally negligent

manner which caused the death of Jason and constituted felony child endangerment as well as involuntary manslaughter.

The next question before us is whether a reasonable juror would have understood the governing law (*People* v. *Kelly* (1992) 1 Cal.4th 495, 526 [3 Cal.Rptr.2d 677, 822 P.2d 385]) and the points appellant sought to make at trial (*People* v. *Gardner, supra,* 37 Cal.App.4th at p. 482) even though no specific instruction was given on superseding cause. ■ In resolving such question we look to the evidence, instructions and arguments of counsel. (*People* v. *Kelly, supra,* 1 Cal.4th at p. 526; *People* v. *Schmies, supra,* 44 Cal.App.4th at pp. 48, 52; *People* v. *Pike, supra,* 197 Cal.App.3d at pp. 742-743.)

■ The jury was instructed with CALJIC No. 9.37—definition of felony child endangerment; CALJIC No. 8.45—involuntary manslaughter defined; CALJIC No. 3.35—concurrence of act and criminal negligence; CALJIC No. 3.36—criminal negligence defined; CALJIC No. 3.40—direct and proximate cause; and CALJIC No. 3.41—more than one cause/concurrent cause. The prosecutor's argument posed the principal questions raised by the evidence as: "[D]id [appellant] encourage 14-year-old Jason Campbell to play Russian roulette?"; "Is encouraging a 14-year-old criminal negligence?"; "Who caused Jason Campbell's death? Jason Campbell pulled the trigger. Didn't he cause his own death? Isn't he to be responsible and solely responsible for his death and we'll just go on?" Defense counsel posed the same questions: "Who's responsible for Jason C.'s death?"; ". . . [W]hat did [appellant] do to encourage Jason Campbell to shoot himself?"; "Did [appellant] create a circumstance—and we're talking about the circumstances of that evening where it could have reasonably been foreseen that Jason Campbell had taken his life?"

We conclude that these instructions and arguments fully informed the jury of the relevant law and properly framed the superseding cause issue into layman's terms as the following question: On the evidence presented was appellant criminally liable for the death of Jason even though Jason shot himself?

III.-VIII.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante,* page 473.

## IX. DISPOSITION

The judgment is affirmed.

Hanlon, P. J., and Saldamando, J.,* concurred.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.