[No. D039050. Fourth Dist., Div. One. Mar. 13, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
FERNANDO BANUELOS, Defendant and Appellant.

**COUNSEL**

Scott M. Rand, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting and Jonathan J. Lynn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HUFFMAN, Acting P. J.**—A jury convicted Fernando Banuelos of assault with a deadly weapon by means of force likely to produce great bodily injury. (Pen. Code,[1] § 245, subd. (a)(1).) The jury also found true allegations that Banuelos personally used a deadly weapon in the commission of the assault (§ 1192.7, subd. (c)(23)), and personally inflicted great bodily injury upon the victim, who was not an accomplice of that offense (§ 12022.7, subd. (a)). The trial court sentenced Banuelos to a total prison term of five years, consisting of the lower term of two years for the assault with a deadly weapon, and three years consecutive for the personal infliction of great bodily injury enhancement.

Banuelos appeals, contending the trial court prejudicially erred when it instructed the jury with the "*Corona* instruction"[2] contained within CALJIC No. 17.20 which permitted the jury to find personal infliction of great bodily injury even where the evidence was insufficient to determine which person actually inflicted such injury. He also asserts that even if a *Corona* instruction is a correct statement of the law, the prosecution failed to prove the impossibility of determining who inflicted the injury and the instruction as given was misleading and did not properly instruct the jury. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On December 16, 2000, 16-year-old Peter A. was at a party and saw Banuelos, who he knew had dated a friend of his ex-girlfriend. Around 10:00 p.m., "some guy" approached Peter, telling him that he was going to fight Banuelos. Peter walked with the man outside the party house to another location, where another person told Peter he was the one that was going to fight him, claiming Peter had said "Fuck Logan" and "Fuck all of them," apparently in reference to a Logan area street gang. The man began to punch Peter in the head and body, along with about seven other men, including Banuelos.

When the beating stopped and Peter saw Banuelos pull out a small wooden bat from his pants, he ran down the street followed by Banuelos and the others. Peter ran up some stairs at an apartment building and the group stopped at the bottom waiting for him. They demanded Peter come downstairs because he was going to fight with "another guy." When Peter

---

[1]All statutory references are to the Penal Code unless otherwise specified.

[2]The referenced part of the instruction is based on this court's case of *People v. Corona* (1989) 213 Cal.App.3d 589 [261 Cal.Rptr. 765] (*Corona*).

eventually came down the stairs, Banuelos hit him in the right jaw with the bat, knocking him down. While Peter was on the ground, the others started socking and kicking him all over his body. Although Peter had his eyes closed most of the time and used his arms to shield himself, he noticed Banuelos additionally hitting him on his shoulder. Peter also felt an object strike his head and heard Banuelos say, "Fuck your life." At some point, the assailants left and Peter felt pain on the top of his head and his face.

Peter was taken home and then to the hospital where he spent a day and a half due to injuries suffered in the attacks. In addition to numerous bruises on his back and arms, Peter had two cuts on his head that required staples to close, and a broken jaw that required surgery and was wired shut for four months.

Although Peter had talked with the police several times after the incident, he originally denied knowing any of his assailants, merely saying he had been jumped by a group of 10 Hispanic males, who punched and kicked him. After Peter moved to a new address and had changed schools, he finally identified Banuelos as one of his assailants and stated he had had a bat during the attack. Peter was afraid to give this information earlier because Banuelos knew where he and his family had lived before the move.

At trial, Peter testified to the above facts. The woman who had the party on December 16, 2000, also testified in the prosecution case. When she saw Peter and Banuelos walking away from her yard with some other guys following them that night, she went outside to watch what was happening. When she saw Peter followed by the others run further away, she moved to where she could see and witnessed Banuelos hitting Peter with his hands as Peter was lying down. Banuelos was yelling at Peter not to disrespect his girlfriend or him. When Banuelos stopped, one of the other men in the group tossed a rock at Peter's head.

A woman who lived at the apartments where the fight occurred testified that after hearing a loud noise that night, she looked outside to see a group of about 10 guys talking to another guy on the stairs. When the guy finally went down the stairs, a man in a black leather jacket, who looked like he had something in his hand, hit the man and she could hear the impact of the hit from her apartment. The woman also saw several other men pick things up and hit the man, including one man throw a rock that hit him.

A detective who investigated the incident related Peter's various versions of the fight before identifying Banuelos as one of the attackers. The detective also interviewed Banuelos after his arrest. Banuelos eventually told the

detective he had been in a one-on-one fight with Peter for disrespecting his girlfriend, and that he had punched him in the face before continuing to hit him with his hands when he fell to the ground. Banuelos recalled he was wearing a black leather jacket that night.

The trauma surgeon who treated Peter at the hospital testified he could not tell exactly what instrument or object caused the broken jaw or any other injury to Peter's head.

DISCUSSION

I

*Section 12022.7, Subdivision (a), Corona and CALJIC No. 17.20*

 Banuelos contends the trial court prejudicially erred by instructing the jury with the *"Corona* instruction" contained within CALJIC No. 17.20 which permits a jury to find personal infliction of great bodily injury even where the evidence is insufficient to determine who actually inflicted such injury. By such assertion, Banuelos is essentially asking this court to revisit our decision in *Corona, supra,* 213 Cal.App.3d 589 and find that the group beating portion of CALJIC No. 17.20 added in 1999 based on our holding is contrary to the plain language of section 12022.7 and the holding in the California Supreme Court case of *People v. Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182] *(Cole),* and that it unconstitutionally shifts the burden of proof so as to make the defendant liable for proving he did not inflict an injury that occurs in a group context. Having reconsidered our decision in *Corona,* we disagree with Banuelos's arguments and find *Corona* correctly interprets the law for group beatings.

Former section 12022.7 provided for a three-year enhancement for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony. . . ." In *Cole,* our high court held that the language of section 12022.7 "is clear: the enhancement applies only to a person who himself inflicts the injury." *(Cole, supra,* 31 Cal.3d at p. 572.) Such holding comports with the Legislature's intent in providing a special enhancement for criminals who inflict great bodily injury upon their victims to deter such actions in the future. *(Id.* at p. 573.)

 In *Corona,* we recognized the holding in *Cole, supra,* 31 Cal.3d 568, and the legislative intent of section 12022.7, but found that "[a]pplying

*Cole* uncritically in the context of [a case like this] does not create a deterrent effect. Rather it would lead to the insulation of individuals who engage in group beatings. Only those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished." (*Corona, supra,* 213 Cal.App.3d at p. 594.) Although we did not set out a test for determining when a person becomes a direct participant to the infliction of great bodily injury, we concluded that only "when a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Ibid.*)

CALJIC No. 17.20 was revised in 1999 based on our holding in *Corona, supra,* 213 Cal.App.3d 589, to include a fourth paragraph designed for use when there is a group beating and it is not possible to determine who caused what injury. That paragraph provides: "When a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury, he or she may be found to have personally inflicted great bodily injury upon the victim if 1) the application of unlawful physical force upon the victim was of such a nature that, by itself, it could have caused the great bodily injury suffered by the victim; or 2) that at the time the defendant personally applied unlawful physical force to the victim, the defendant knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant then knew, or reasonably should have known, that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim." (CALJIC No. 17.20 (1999 rev.) (6th ed. 1996).)

Contrary to Banuelos's arguments otherwise, this language is consistent with the holding in *Cole* that a mere aider and abetter cannot receive the special great bodily injury enhancement; only a person who directly participates in the physical attack can receive the enhancement. (*Cole, supra,* 31 Cal.3d at p. 571.) So too does the language of paragraph four of CALJIC No. 17.20 comport with the intent of the Legislature to deter personal infliction of great bodily injury in the future by preventing that intent from being frustrated in cases where multiple assailants directly cause the great bodily injury. Because the instruction requires that it be proven a defendant has personally inflicted an injury on the victim during a group attack, such instruction does not lighten the People's burden of proof as Banuelos asserts.

We conclude that *Corona, supra,* 213 Cal.App.3d 589, is still good law and that the fourth paragraph of CALJIC No. 17.20 based upon such holding is a correct statement of the law.

## II

### *Impossibility*

Relying on *People v. Magana* (1993) 17 Cal.App.4th 1371 [22 Cal.Rptr.2d 59] (*Magana*), Banuelos next contends that even if *Corona, supra,* 213 Cal.App.3d 589, and CALJIC No. 17.20 are valid, the prosecutor in this case failed to show that it was impossible to determine which person caused Peter's great bodily injury. We disagree.

Although the prosecution does bear the burden of showing that it cannot be determined which assailant inflicted a particular injury in the context of a group beating, the evidence adduced during the prosecutor's case here showed such impossibility. The surgeon who had treated Peter, after he had been attacked by Banuelos and approximately eight of his friends, testified Peter had suffered severe cuts to his head which required staples to close and a broken jaw, which required surgery and a four-month recovery with his jaw wired shut. The surgeon conceded under cross-examination that it was impossible to tell which attack or instrument caused the broken jaw. Although Banuelos may have done so when he directly hit Peter in the jaw with a bat, the surgeon could not medically conclude that it was the bat, rather than another blunt object, like the rock that was tossed at Peter by another assailant, or some other unknown object witnesses saw the assailants pick up and hit Peter with, that caused Peter's broken jaw. The surgeon also stated that a strike from a bat could cause damage ranging from minor bruises all the way to death depending on how and where the blow hit the victim. From this evidence a jury could reasonably conclude that it was impossible to trace Peter's severe head and jaw injuries to any particular blow or assailant.

Banuelos's reliance on *Magana* is misplaced. In *Magana*, the defendant and his codefendant had used two distinctly different firearms when they opened fire on a group of people, killing one and seriously injuring another. (*Magana, supra,* 17 Cal.App.4th at p. 1374.) Because the police had identified different types of bullets and cartridges retrieved from the crime scene and removed from the victims, the reviewing court in *Magana* found it would have been possible for the prosecution to show which injuries were caused by the defendant, and thus the true finding of the section 12022.7

enhancement for the defendant was not supported by substantial evidence. (*Magana, supra,* 17 Cal.App.4th at p. 1381.) As noted above, substantial evidence shows that such possibility was not present in this case.

## III

### *The Given Instruction*

Banuelos finally asserts that even assuming *Corona, supra,* 213 Cal.App.3d 589 and CALJIC No. 17.20 are correct statements of the law, the instruction as given was misleading because it failed to inform the jury the prosecution had the burden of proving beyond a reasonable doubt the impossibility of determining which injury was specifically inflicted by which attacker. This contention is without merit.

The instruction given in this case stated CALJIC No. 17.20 verbatim. In addition to the fourth paragraph recited in our discussion above, which makes clear it applies "[w]hen a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury," the very next paragraph of the instruction states, "The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true." (CALJIC No. 17.20.) Banuelos's counsel in closing argument specifically commented that the People had the burden of proving the truth of the allegation for which CALJIC No. 17.20 applied, and referred the jury back to CALJIC No. 2.90 if they had a reasonable doubt. In addition, counsel argued "[t]he prosecution has the burden of proving it's impossible to determine who those other kids [that had attacked Peter] were. Because they have not met their burden, there is a reasonable doubt."

Based on this record, Banuelos cannot show CALJIC No. 17.20 was misleading as to the burden of proving the personal great bodily injury allegation, or that there was a likelihood the jury misunderstood such instruction in light of the evidence, entirety of instructions and arguments of counsel. (See *People v. Cain* (1995) 10 Cal.4th 1, 35, 40 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Hansen* (1997) 59 Cal.App.4th 473, 482 [68 Cal.Rptr.2d 897].) Moreover, if Banuelos thought the given instruction was unclear about the prosecution burden to initially prove it was impossible to determine which person inflicted what injury on Peter, he could have requested a pinpoint instruction to further clarify the matter. He did not do so. No instructional error is shown.

Disposition

The judgment is affirmed.

Nares, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied April 3, 2003, and appellant's petition for review by the Supreme Court was denied June 11, 2003. Kennard, J., was of the opinion that the petition should be granted.