Filed 7/10/24  Wilkerson v. Marin County Dept. of Health and Human Services CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHRISTINA LYNN WILKERSON,<br><br>    Petitioner and Appellant,<br><br>v.<br><br>MARIN COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | A168744<br><br>(Marin County Super. Ct. No. CIV2300540) |

Petitioner and appellant Christina Lynn Wilkerson (mother) drove with her daughter in her car despite having a blood alcohol content (BAC) of 0.219. After she pled guilty to driving with a BAC of 0.08 percent or higher in violation of Vehicle Code section 23152, subdivision (b), respondent Marin County Department of Health and Human Services (Department) substantiated the allegations of severe neglect against mother and reported her for inclusion in the Child Abuse Central Index (CACI).  Mother challenged her inclusion in CACI at a grievance hearing, but the hearing officer denied her challenge.  The trial court then denied mother's writ petition challenging the hearing officer's decision on numerous grounds. Mother now appeals from the court's order.  We affirm.

1

## BACKGROUND

### A.    Mother's History of Alcohol-Related Issues

Mother and father married in 2006 and had a child (daughter) in 2010. In 2012, mother, who has a history of alcohol-related issues, placed daughter, who was two years old at the time, in a high chair and attempted to commit suicide by taking 40 pills of "Effexor, Wel[l]butrin, and Klonopin" while she was drunk. When he came home, father called emergency medical services (EMS). EMS discovered mother lying in bed with "empty bottles of meds."

The San Francisco Human Services Agency (HSA) then filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b). Father was awarded custody of daughter, and mother entered a rehabilitation program. The juvenile court dismissed the petition in 2013 and ordered joint custody of daughter to father and mother. In recommending dismissal of the petition, HSA observed that mother "has made tremendous strides in addressing her sobriety and recovery."

Soon after mother's suicide attempt, father filed for divorce and moved to Marin County with daughter. The marriage was dissolved in 2014. Mother eventually moved to Marin County.

In December 2020, mother drove to father's home to pick up daughter. Father believed that mother, who "could not get out of the car," was drunk and told her "to go home and 'sleep it off.' " The next day, father called the police, who "advised him to call [them] right away if [] mother is suspected of drinking and driving."

### B.    Mother's Drunk Driving Incident

On November 12, 2021, mother left a voicemail message on father's phone after picking daughter up from school. According to father, "[h]er words were badly slurred." Concerned that mother was "driving drunk with"

2

daughter, father called the police, who went to mother's home "for a welfare check." Although mother was not there, the police eventually found her when she drove into a parking garage and parked her car. Daughter, who was 11 years old at the time, sat in the rear seat with a small dog and her seat belt on. According to the police, mother's driving appeared "normal," and she caused no accidents or injuries.

The police officers approached mother and explained why they were there. According to the officers, mother had "watery eyes," and her "speech was slurred." The officers also smelled alcohol on her breath and person. Mother claimed that her speech was slurred due to "her retainers" and denied that she was intoxicated.

One officer spoke with daughter, who told him that mother "sometimes drank beer during the day." According to daughter, mother " 'talks funny' when she drank" and "was acting and talking . . . in the same manner as she did when she has been drinking."

The police administered field sobriety tests — which mother failed. The police then arrested mother, contacted child protective services, and released daughter and the dog to father. Mother provided a blood sample — which revealed a BAC of 0.219.

Father returned the dog to mother the day after her arrest. At that time, mother denied that she was "intoxicated" and blamed father for calling the police.

### C.    Mother's Criminal Case and Social Services Investigation

Mother was charged with:  (1) driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)); (2) driving with a BAC of 0.08 percent or higher (*id.*, § 23152, subd. (b)); and (3) "placing the health of a child in

danger" (Pen. Code, § 273a, subd. (b)).[1]  The complaint also alleged that mother had:  (1) a BAC of 0.15 percent or higher (Veh. Code, § 23578); (2) a BAC of 0.20 percent or higher (*id.*, § 23538, subd. (b)(2)); and (3) a child under the age of 14 in the vehicle (*id.*, § 23572).

Soon after her arrest, mother registered for Soberlink and tested negative for alcohol.  Mother also attended AA meetings daily and enrolled in the nine-month DUI program.

Melanie Lopez, an emergency response investigator with the Department, conducted the social services investigation.  She reviewed mother's "previous child welfare service history" and police reports and interviewed mother, father, daughter, and others.

Lopez met daughter at school.  Daughter wore "clean clothing," dressed "appropriately," and exhibited "good hygiene."  Daughter told Lopez that mother drank beer "daily," but that she did not know how much mother drank each day.  According to daughter, mother "acts 'weird by wont [sic] do[ing] stuff or slurring her words' " when she drinks.  Daughter also stated that mother "does drink and drive with [her] in the car" — which makes her " 'not feel safe.' "  On the day of mother's arrest, daughter stated that mother "was slurring her words."  Although daughter wore her seat belt in the back seat, "she felt scared."  She did not, however, see her mother drink alcohol that day.  According to daughter, mother "drinks and drives with [her] in the car 'a lot or pretty often.' "  She also stated she that did not "like when [] mother drinks alcohol" or "feel safe when [] mother" drinks.

Lopez interviewed mother at her home.  "The home was . . . clean and well maintained."  Mother denied slurring her speech when she spoke to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

police on the day of her arrest. Instead, she claimed her speech sounded slurred due to "her retainers." Mother did not know how much she drank that day but admitted that "she had at least [one] beer." She denied any history of alcohol abuse and claimed that she only drank alcohol " 'periodically.' " Mother maintained that she had been "sober for a decade and the longest time she maintained sobriety was in 2004 through 2012 and again in 2012 through 2016." She acknowledged that work stress and COVID triggered her alcohol use. Finally, she told Lopez that she had registered for Soberlink and attended AA meetings.

When Lopez spoke with father, he explained that he called the police because he suspected that mother was drunk when she picked daughter up from school. Father also mentioned the December 2020 incident when mother drove drunk to pick up daughter and other instances where mother drank to the point of slurring her words. He claimed that mother had never been able "to maintain her sobriety."

Finally, Lopez spoke with C.M., father's support person. C.M, "a clinical psychologist and substance abuse researcher," told Lopez that she did not believe that "mother's alcohol use . . . would impact [her] ability to parent."

Based on Lopez's investigation and report, the Department substantiated the allegation of severe neglect against mother. The Department found by a "preponderance of the evidence (51%)" that mother's "willful acts caused [daughter] to be placed in a situation of her health to be endangered as proscribed by [] section 11165.3." As a result, mother is now listed in CACI.

### D. Mother's Guilty Plea and Grievance Hearing

Mother requested a grievance hearing so she could challenge her

5

inclusion in CACI. The Department initially denied the request because mother's criminal charges were pending.

In June 2022, mother pled guilty to driving with a BAC of 0.08 percent or higher in violation of Vehicle Code section 23152, subdivision (b). All remaining counts and enhancements were dismissed.

Following her guilty plea, mother renewed her request for a grievance hearing. The Department, however, denied the request, claiming that "there had been a determination of 'suspected child abuse or neglect' " in mother's criminal case. Although mother repeatedly informed the Department of its error, the Department refused to give her a hearing. As a result, mother filed a writ petition, and we issued an alternative writ of mandate, ordering the Department "to grant [mother] a grievance hearing within 60 days or to show cause why such relief should not be granted." The Department then agreed to give mother a grievance hearing on October 19, 2022.

On September 8, 2022, mother requested discovery, "including all reports and attachments and a copy of the grievance hearing officer's curriculum vitae [(CV)]." The Department refused to produce any documents but agreed to their inspection. Mother's counsel inspected the documents on September 23, 2022. During the inspection, the Department prohibited counsel from copying or photographing any documents. The Department also refused to provide the hearing officer's CV even though it had "received 'a cut off version of the [] officer's resume.' "

Before the grievance hearing began, the Department spoke with the hearing officer about logistics outside the presence of mother and her counsel. The Department did not, however, discuss "any issue in this matter." At the hearing, the Department also provided mother and the officer with a hard copy of all documents that her counsel had inspected in September.

6

At the beginning of the hearing, the hearing officer told the parties that she was "not affiliated with either Social Services or the complainant." Mother's counsel then argued that the Department's refusal to provide her with copies of the documents before the hearing violated due process by making it "impractical if not impossible to fully and competently prepare for a hearing of this nature . . . ." The hearing officer noted that if mother "is declaring that" she is "not ready to go forward," then it would "just be an issue that I have to address in the decision." In response, counsel stated that mother "want[ed] to proceed today" and that he "just wanted to make a record that we're proceeding without having been provided copies of these documents so [he] could prepare for the hearing as [he] would like to prepare for it."

Mother's counsel also complained about the Department's refusal to produce the hearing officer's CV even though it had part of her resume. The officer responded that her resume was provided to the Department in error and that mother was "not entitled to a copy of [her] qualifications." When mother's counsel asked the officer to state her qualifications on the record, the officer responded that she met "the qualifications under the regulatory [], implementing statute."

Only Lopez testified at the hearing. She confirmed that she reviewed mother's "previous child welfare service history" and "the police reports" and interviewed daughter, mother, and father. She testified that, based on her investigation, the allegation that mother placed daughter "in a situation in which her person or health was endangered" should be substantiated. According to Lopez, mother "willfully placed her child in the vehicle with knowledge that she was under the influence . . . ."

Lopez, however, conceded that daughter only stated that mother often

7

drank and drove — which Lopez interpreted as driving under the influence. The Department also stipulated that mother did not drink *while* she drove. Lopez further conceded that there were no issues with mother's driving at the time of her arrest, that she caused no accidents or injuries, and that daughter "was dressed appropriately" and wore her seat belt. She also testified that mother "loves and cares very much about [] daughter" and did not "intentionally want[] to hurt her child."

After the hearing, the hearing officer denied mother's grievance in writing. Although the officer agreed that the Department erred by refusing to provide copies of documents to mother before the hearing, the officer concluded that mother waived any challenges to this error by declining a continuance. The officer also concluded that mother was not entitled to information about her "professional history . . . in order to challenge [her] 'qualifications,'" particularly in the absence of any evidence that the officer "could not hold an impartial hearing." Finally, the officer found that "there was a substantial probability that [daughter] was in a situation where her safety was endangered and that this was a result of the recklessness of [mother] in operating a vehicle with [daughter] while intoxicated." Accordingly, she held that "[t]here is sufficient evidence to find the existence of 'severe neglect' given that the situation has been declared unsafe by law, [mother] pled to that factual basis for her DUI charge and her prior awareness of the dangerous situation."

### E.    Mother's Writ Petition and Appeal

Mother filed a writ petition, challenging the hearing officer's decision. She sought her removal from CACI or a new hearing "with due process." The trial court denied the petition. In a thorough and well-written order, the court found that "the weight of the evidence supports [the Department's]

8

determination that [mother's] conduct was reckless and willful and amounted to 'severe neglect' within the meaning of [] §§ 11165.2 and 11165.3."

The trial court also rejected mother's due process claims. First, the court held that mother was not entitled to the hearing officer's CV and that there was no evidence the officer "was unqualified or biased" or her refusal to provide the CV "prejudiced [mother's] right to a fair hearing." Second, the court found that "the [hearing] participants . . . implicitly treated the documents as admitted" even though they were "not formally admitted into evidence." Third, the court concluded that the officer properly sustained the objection to mother's questions about Lopez's discussions with counsel, that the officer did not ask improper leading questions, and that mother had not established any prejudice. Finally, the court rejected mother's claim that the Department engaged in improper ex parte communications with the officer. Instead, the court found that the Department appropriately spoke with the officer about "ordinary procedural matters."

Mother timely appealed.

## DISCUSSION

### A. Standard of Review

"Because recordation in CACI as a probable child abuser impinges upon fundamental rights, the [trial] court must exercise its independent judgment in determining whether the evidence before the Department established that the report is 'substantiated.' On appeal from the trial court's judgment in such a case, the precedents do not authorize the reviewing court to exercise its independent judgment with respect to the trial court's factual findings. Rather the [reviewing] court is required to apply the substantial evidence rule, under which the trial court's findings must be upheld if supported by

9

substantial evidence. . . . With respect to questions of law, of course, the [reviewing] court exercises its independent judgment. . . . And where the controlling facts are undisputed, their effect is a question of law." (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 84–85 (*Gonzalez*), citations and fn. omitted.)

Thus, " '[a] challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law.' " (*Gonzalez, supra,* 223 Cal.App.4th at p. 96.) But any factual finding relied upon by the trial court in rejecting such a challenge is reviewed for substantial evidence. (*Ibid.*)

When reviewing an administrative decision under Code of Civil Procedure section 1094.5, we "may inquire" into " 'whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' " (*Gonzalez, supra,* 223 Cal.App.4th at p. 96.) "The ' "fair trial' " requirement . . . simply [requires] a 'fair administrative hearing,' which affords the appellant a ' " ' "reasonable opportunity to be heard." ' " ' " (*Pinheiro v. Civil Service Com. for County of Fresno* (2016) 245 Cal.App.4th 1458, 1463, citation omitted.) An abuse of discretion occurs "where the agency 'has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Gonzalez,* at p. 96.) Finally, we will not reverse an administrative decision unless the error is prejudicial — i.e., the error would have "changed the outcome." (*Quintanar v. County of Riverside* (2014) 230 Cal.App.4th 1226, 1236 (*Quintanar*).)

### B. Due Process Claims

Mother claims that her due process rights were violated throughout her grievance hearing. We do not find any of those claims to be persuasive.

1. *Failure to Receive Hard Copies of Documents Before the Hearing*

Mother contends the Department violated due process by refusing to provide her with copies of the documents she requested and inspected before the hearing. She also contends the hearing officer's decision should be reversed because the officer considered documents that were not formally introduced into evidence. We reject both contentions.

First, mother was not prejudiced even if, as concluded by the hearing officer, the Department erred by refusing to provide mother with hard copies of the documents she requested before the hearing. (See *Quintanar*, *supra*, 230 Cal.App.4th at p. 1236.) Mother concedes that her attorney inspected those documents before the hearing. Although mother implies that her attorney did not have enough time to review the documents during that inspection, she *never* asked to inspect them again even though the hearing was still several weeks away. Nor did she ask for additional time to review the documents provided to her at the hearing. Instead, she told the hearing officer that she wished to proceed despite failing to receive copies of the documents earlier. Finally, mother does not explain how receiving those copies before the hearing would have changed the outcome. Under these circumstances, she suffered no prejudice.

Second, the hearing officer's failure to formally admit the documents into evidence does not support reversal. As the trial court pointed out, mother "implicitly treated [those] documents as admitted" by referring to them during her cross-examination of Lopez. Moreover, mother never

11

objected to any of the documents. Thus, mother waived any challenge to the hearing officer's reliance on them.

In any event, a grievance "hearing need not be conducted according to technical rules relating to evidence and witnesses." (Gov. Code, § 11513, subd. (c).) Indeed, "the strict rules of evidence which obtain in the courts are *not* enforced in administrative proceedings." (*Jenner v. City Council of City of Covina* (1958) 164 Cal.App.2d 490, 496, italics added; see also *Pinsker v. Pacific Coast Soc. of Orthodontists* (1974) 12 Cal.3d 541, 555 ["The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial"].) Thus, the hearing officer did not have to formally admit any documents into evidence before considering them where, as here, the parties had ample opportunity to review the documents and did not object to any of them.

*La Prade v. Department of Water & Power* (1945) 27 Cal.2d 47 (*La Prade*) does not hold otherwise. Although *La Prade* did state that "[n]othing may be treated as evidence which has not been introduced as such" (*id.* at p. 51), mother conveniently ignores the qualifying language immediately following that statement: "inasmuch as a hearing requires that the party be apprised of the evidence against him in order that he may refute, test[,] and explain it." (*Id.* at p. 52.) Consistent with this qualifying language, *La Prade* prohibited a hearing officer from considering evidence that the accused had no opportunity to review. By contrast, the hearing officer in this case only considered evidence that mother had a chance to "refute, test[,] and explain." (*Ibid.*) *La Prade* does not therefore help her.

Accordingly, we reject any due process challenges based on the documents considered by the hearing officer.

12

2.     *Ex Parte Communications*

Mother argues that the Department engaged in improper ex parte communications with the hearing officer.  We disagree.

"While the proceeding is pending there shall be no communication, direct or indirect, regarding any *issue* in the proceeding, to the presiding officer from an employee or representative of an agency that is a party or from an interested person outside the agency, without notice and opportunity for all parties to participate in the communication."  (Gov. Code, § 11430.10, subd. (a), italics added.)  "A 'presiding officer' is defined as an officer who presides over an evidentiary hearing."  (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 9 (*DABC*).)

Mother questions three communications between the Department and the hearing officer:  (1) the Department's submission of documents to the officer for the hearing; (2) communications between the Department's counsel and the officer before mother and her attorney entered the conference room for the hearing; and (3) the Department's receipt of the officer's partial resume before the hearing.  None of these communications, however, warrant reversal.

First, the Department's submission of documents to the hearing officer was not an improper ex parte communication.  Mother's counsel inspected those documents several weeks before the hearing, and the Department provided hard copies to mother at the hearing.  Thus, the Department's submission of documents to the officer was neither ex parte nor improper.  Indeed, the Department did nothing more than provide copies of exhibits to

be used as evidence at the hearing to all participants — something that occurs in every trial or hearing.

*Rondon v. Alcoholic Beverage Control Appeals Bd.* (2007) 151 Cal.App.4th 1274 (*Rondon*) does not suggest otherwise. In *Rondon*, a state agency gave "its ultimate decision maker access to prosecuting attorneys' hearing reports" without apprising the other party. (*Id.* at p. 1289.) The court of appeal therefore concluded that the communication was ex parte and extra-record. (*Id.* at pp. 1288–1289.) Neither is true here. Mother had ample opportunity to inspect the documents at issue before the hearing, and those documents are part of the record.

Second, any ex parte communications between the Department and the hearing officer just before the hearing were not improper because they did not concern any "issue in the proceeding." (Gov. Code, § 11430.10, subd. (a).) As explained by the Department's counsel in his declaration, the Department *only* communicated with the hearing officer "regarding the logistics of setting up the [Z]oom hearing, to make sure that the hearing officer, parties, counsel[,] and witnesses would all be able to hear and see each other. There were *no* discussions with the hearing officer outside the presence of [mother] and her attorney regarding any issue in this matter." (Italics added.) Mother counters that this declaration should be discounted because she has "no ability to prove otherwise." But as the trial court correctly pointed out, mother's speculation is not enough to establish that any improper ex parte communications took place.

Neither *DABC* nor *Rondon* compels a contrary conclusion. Both confirm that only ex parte communications "about the substance of the case" (*DABC*, *supra*, 40 Cal.4th at p. 17) or "substantive issues" (*Rondon*, *supra*,

14

151 Cal.App.4th at p. 1288) are prohibited.  Because there is no evidence that the Department communicated with the hearing officer about any substantive issues outside of the presence of mother and her counsel, there can be no due process violation.

Finally, the Department's inadvertent receipt of the hearing officer's partial resume does not warrant reversal.  To the extent the provision of that resume may be construed as an ex parte communication, it had no bearing on any substantive issue resolved at the hearing.  Moreover, the hearing officer made clear that her resume should not have been provided to the Department and, in doing so, implicitly barred the Department from using it during the hearing.  Thus, we do not see how the resume had any bearing on the decision by the officer.  Mother does not argue otherwise.  Under these facts, she has not established any prejudice.  (*Quintanar*, *supra*, 230 Cal.App.4th p. 1236.)

3.　*Failure to Disclose the Hearing Officer's CV*

Mother contends the hearing officer's refusal to produce her CV violated due process even though the officer stated, on the record, that she had the requisite "qualifications."  We disagree.

Under the grievance procedures for challenging a CACI listing, the hearing officer must be "[a] staff or other person who is knowledgeable of the child welfare services field."  (Cal. Dept. of Social Services, Grievance Procedures for Challenging Reference to the Child Abuse Central Index, SOC 833 (Mar. 2012) p. 1 (SOC 833) <https://cdss.ca.gov/cdssweb/entres/forms/English/SOC833_Updated2012.pdf> [as of July 9, 2024].)  The party challenging the listing may request the

disqualification of the officer "upon the grounds that a fair and impartial hearing cannot be held or a decision cannot be rendered." (*Ibid.*)

Mother argues that she is entitled to the hearing officer's CV so she can verify the officer's qualifications. Otherwise, mother claims that she would be in a scene from "Alice and Wonderland": she cannot disqualify a hearing officer without knowing the officer's qualifications; yet she cannot obtain any information about those qualifications. The grievance procedures, however, only give mother the right to request disqualification if she cannot get a "fair and impartial" hearing or decision — and not based on the officer's qualifications. (SOC 833, at p. 1.) More notably, mother identifies, and we could find, no authority requiring that the officer affirmatively establish or document her qualifications. Absent such authority, we will not impose such a requirement. (See *Vinson v. Snyder* (1999) 75 Cal.App.4th 182, 187–188 [refusing to require that a hearing officer "document his or her expertise . . . . [¶] . . . [i]n the absence of statutory or judicial authority"].) Moreover, we will not do so where, as here, the requirement would be "time-consuming and add an essentially meaningless hoop through which a hearing officer must jump before he or she can render a decision." (*Id.* at p. 188.)

4. *The Department's Invocation of the Attorney-Client Privilege*

During cross-examination, mother's counsel asked Lopez about her discussions with counsel for the Department. The hearing officer, however, sustained the Department's objection on the ground of attorney-client privilege. Mother argues that the officer erred in doing so and that this error prevented her from establishing that counsel for the Department "coached" Lopez to testify that daughter told her that mother drove under the influence. We find no error here. "It is well-settled that a public entity enjoys an

16

attorney-client relationship with its lawyers and the attorney-client privilege protects communications made in the course of that relationship." (*Wood v. Superior Court* (2020) 46 Cal.App.5th 562, 576.) Lopez testified that she investigated the allegations against mother as part of her job with the Department. Her communications with counsel for the Department are therefore protected by the attorney-client privilege. (See *Vela v. Superior Court* (1989) 208 Cal.App.3d 141, 149 [" 'Where the employee's connection with the matter grows out of his employment to the extent that his report or statement is required in the ordinary course of the corporation's business, the employee is no longer an independent witness, and his statement or report is that of the employer' "].) Mother's speculation that counsel for the Department improperly "coached" Lopez does not establish any exception to the privilege.

In any event, there is no prejudice. (See *Quintanar*, *supra*, 230 Cal.App.4th at p. 1236.) To the extent Lopez was coached to testify that daughter told her mother drove *under the influence*, Lopez clarified, upon cross-examination, that daughter only stated that mother regularly drank and drove and that Lopez herself interpreted this statement to mean that mother regularly drove "under the influence." The Department also stipulated that mother did not drink while she drove. Thus, mother cannot establish a "prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5.)

5.    *The Hearing Officer's Questioning of Lopez*

Mother contends she did not receive a "fair hearing" (Code Civ. Proc., § 1094.5), because the hearing officer's questioning of Lopez deprived her of "a fair opportunity to defend herself" (*Pinsker v. Pacific Coast Society of Orthodontists*, *supra*, 12 Cal.3d at p. 555). According to mother, the officer's

17

questions were "leading" and caused Lopez to "stretch" the meaning of daughter's claim that mother regularly drank and drove. But questions from a hearing officer are not improper absent some "evidence of bias or prejudice." (*Marini v. Department. of Alcoholic Beverage Control* (1960) 177 Cal.App.2d 785, 787.) In this case, the hearing officer merely sought to clarify daughter's statements to Lopez about mother's drinking and driving. She therefore asked Lopez whether daughter told her that mother drank "while driving" or drove "under the influence." Although the officer's questions could have been more precise, there is nothing to suggest that they had any purpose other than "to elicit the testimony which [Lopez was] voluntarily prepared to give." (*Ibid.*)

In any event, mother suffered no prejudice. (*Quintanar, supra,* 230 Cal.App.4th at p. 1236.) As explained above, Lopez eventually clarified that daughter only told her that mother regularly drank and drove — and not that she drove under the influence or while driving. (See *ante*, at p. 17.) Thus, any confusion over daughter's statements caused by the hearing officer's questions was eliminated through Lopez's subsequent testimony. For this reason, the refusal of the hearing officer to entertain objections to her questions also does not warrant reversal.

## C.     Sufficiency of the Evidence

The Department substantiated the allegation of severe neglect against mother, resulting in her inclusion in CACI. Mother contends there was insufficient evidence for the Department to do so. We are not persuaded.

Under the Child Abuse and Neglect Reporting Act (CANRA), an agency that substantiates a report of "severe neglect" must submit that report to the California Department of Justice for inclusion in CACI. (§ 11169, subd. (a).)

18

A " '[s]ubstantiated report' [includes] a report that is determined by the investigator who conducted the investigation to constitute . . . neglect . . . based upon evidence that makes it more likely than not that . . . neglect . . . occurred." (§ 11165.12, subd. (b).) As relevant here, " '[s]evere neglect' [] means those situations of neglect where any person having the care or custody of a child willfully causes or permits the person or health of the child to be placed in a situation such that their person or health is endangered as proscribed by Section 11165.3 . . . ." (§ 11165.2, subd. (a).) And section 11165.3 defines in relevant part "the endangering of the person or health of a child," as "a situation in which any person . . . having the care or custody of any child, willfully causes or permits the person or health of the child to be placed in a situation in which his or her person or health is endangered."

Mother argues that there is no evidence that she "*willfully* cause[d]" daughter "to be placed in a situation in which" her "person or health [was] endangered." (§ 11165.3, italics added.) According to mother, the term "willfully in the CACI statutes . . . differentiate[s] between conduct that is intentionally dangerous to a child as opposed to unintentional." Mother, however, misconstrues that term. As used in CANRA, "willfully" requires only criminal negligence on the part of mother — of which there is more than enough evidence.

Because the pertinent language in CANRA is nearly identical to analogous language in section 273a (compare § 11165.3, subd. (a) ["willfully causes or permits the person or health of the child to be placed in a situation in which his or her person or health is endangered"] with § 273a, subd. (b) ["willfully causes or permits that child to be placed in a situation where his or

19

her person or health may be endangered"]), we may look to cases interpreting section 273a when determining the mental state required for a finding of severe neglect under CANRA (*Gonzalez, supra*, 223 Cal.App.4th at p. 87). In *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1682 (*Rippberger*), the court of appeal established over 30 years ago that the term "willfully," as used in section 273a, describes a crime "of criminal negligence and not of malice or specific intent." (See *People v. Hansen* (1997) 59 Cal.App.4th 473, 478–479 (*Hansen*) [same]; see also *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 917 [citing *Hansen* with approval].) The same must therefore be true for a finding of severe neglect under CANRA notwithstanding mother's unsupported assertion to the contrary. (*Gonzalez*, at p. 87.)

Thus, mother acted willfully for purposes of CANRA if her conduct " 'amount[ed] to a reckless, gross or culpable departure from the ordinary standard of due care.' " (*Hansen, supra*, 59 Cal.App.4th at p. 478.) The test is objective: whether "a reasonable person in [mother's] position would have been aware of the risk involved." (*Rippberger, supra*, 231 Cal.App.3d at p. 1682.) "Criminal negligence may [therefore] be found even" if mother acted "with a sincere good faith belief that" her "actions pose no risk." (*Ibid*.) And " '[t]here is no requirement that the actual result be great bodily injury.' " (*People v. Sargent* (1999) 19 Cal.4th 1206, 1216.)

Here, there is ample evidence that mother was criminally negligent. As the trial court pointed out: "The undisputed evidence shows that [mother] was arrested for driving her daughter while under the influence of high levels of alcohol in her system; [mother]'s driving on this occasion made her daughter feel scared; [mother] drives her daughter 'a lot or pretty often' after drinking, causing her daughter not to feel safe; [mother] pleaded guilty to

20

driving her daughter while having a BAC level greater than 0.20; [mother] has a history of alcohol and drug abuse . . . and she was aware that she should not drink and drive." Under these undisputed facts, a reasonable person would have been aware of the serious risk to daughter posed by mother's conduct. Indeed, mother's decision to drive with daughter despite having a BAC over two and half times the legal limit is, by itself, arguably enough to establish criminal negligence. That mother regularly drove with daughter after drinking, even though it scared daughter, removes any lingering doubt. Thus, there is substantial evidence that mother's conduct constituted a " ' "reckless, gross, or culpable departure from the ordinary standard of due care." ' " (*Hansen*, *supra*, 59 Cal.App.4th at p. 478–479.)

*People v Hagen* (1998) 19 Cal.4th 652 (*Hagen*) is inapposite. In *Hagen*, the court of appeal held that "willfulness, *as an element of the offense prohibited by former [Revenue & Taxation Code] section 19405(a)(1)*, requires the prosecution to prove the defendant made the perjurious statement in voluntary, intentional violation of a known legal duty." (*Id.* at p. 666, italics added.) Because *Hagen* did not address CANRA or section 273a, it has no relevance here.

Accordingly, we find that there is sufficient evidence to support a finding of severe neglect by mother under CANRA.

## DISPOSITION

The order denying mother's writ petition is affirmed.

_____
CHOU, J.

We concur.

_____
JACKSON, P. J.

_____
SIMONS, J.